# United States Court of Appeals
## For the First Circuit

No. 05-2136

NEW HAMPSHIRE MOTOR TRANSPORT ASSOCIATION;
MASSACHUSETTS MOTOR TRANSPORTATION ASSOCIATION, INC.;
VERMONT TRUCK & BUS ASSOCIATION, INC.,

Plaintiffs, Appellees,

v.

G. STEVEN ROWE, in his official capacity as Attorney General
for the State of Maine,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE
[Hon. D. Brock Hornby, U.S. District Judge]

Before

Boudin, Chief Judge,

Stahl, Senior Circuit Judge,

and Howard, Circuit Judge.

Paul Stern, Deputy Attorney General, with whom G. Steven
Rowe, Attorney General, Melissa Reynolds O'Dea, Peter B. LaFond,
and Christopher C. Taub, Assistant Attorneys General, Office of
the Attorney General, were on brief, for appellant.
    Ruth N. Borenstein, with whom Paul T. Friedman, Lawrence R.
Katzin, Morrison & Foerster LLP, Michael A. Nelson and Jensen
Baird Gardner & Henry, were on brief, for appellees.

May 19, 2006

**HOWARD**, **Circuit Judge**.  In 2003, Maine enacted a law to restrict and regulate the sale and delivery of tobacco products purchased via the internet or other electronic means.  Several trade associations, representing air and motor carriers of property, brought this action against the Maine Attorney General alleging that certain provisions of this law are preempted by the Federal Aviation Administration Authorization Act of 1994 (FAAAA).  The district court granted summary judgment for the associations and enjoined Maine's Attorney General from enforcing the law.  We affirm in all respects but one.[1]

**I.**

**A.    The FAAAA**

There are two FAAAA preemption provisions at issue in this case.  See Pub. L. No. 103-305, § 601; 108 Stat. 1569.  The first provides that a "State . . . may not enact or enforce a law . . . related to a price, route, or service of any motor carrier . . . with respect to the transportation of property."  49 U.S.C. § 14501(c)(1).  The second states that a "State may not enact or enforce a law . . . related to a price, route, or service of an air carrier or carrier affiliated with a direct air carrier through common controlling ownership when such carrier is transporting

---

[1]We are grateful for the amicus curiae briefs filed by several state attorneys general, the American Trucking Association, the Federal Express Corporation and the United States Chamber of Commerce.

property by aircraft or by motor vehicle . . . ." 49 U.S.C. §
41713(b)(4)(A).

These provisions combine to bar states (subject to certain exceptions discussed later) from enacting laws related to prices, routes, or services of air or motor carriers of property. They are "intended to function in the exact same manner with respect to [their] preemptive effects." H.R. Conf. Rep. 103-677 at 85, reprinted in 1994 U.S.C.C.A.N. at 1757.

### B.      The Maine Tobacco Delivery Law

In 2003, the Maine Legislature adopted "An Act to Regulate the Sale of Tobacco Products and to Prevent the Sale of Cigarettes to Minors." See L.D. 1236 (121st Maine Leg.) (codified at 22 M.R.S.A. §§ 1551, 1555-C & 1555-D) (Tobacco Delivery Law). The Tobacco Delivery Law was prompted by the recent increase in internet tobacco sales which are consummated by direct delivery to consumers through the mail or by commercial carriers. See Testimony of Representative Glen Cummings Before the Joint Standing Committee on Health & Human Services (Apr. 29, 2003). This phenomenon has complicated Maine's efforts to regulate "the sale of tobacco products to minors" and caused it to lose "tremendous tax revenues as a result of tax free sales by unlicensed companies." Id. The associations persuaded the district court that §§ 1555-C(3)(C) & 1555-D are preempted by the FAAAA.

-3-

### 1. § 1555-C(3)(C)

Maine's Tobacco Delivery Law permits a licensed tobacco retailer to sell tobacco products[2] directly to consumers via the internet or other electronic means so long as the retailer takes specified steps to ensure that sales are not made to minors. See id. §§ 1555-C(2) & (3). One such step requires the retailer to use a carrier that will ensure that: (1) the purchaser of the tobacco products is the same person as the addressee of the package; (2) the addressee is of legal age to purchase tobacco products and sign for the package; and (3) if the addressee is under 27 years of age, that she show a valid government-issued identification verifying that she is old enough to purchase tobacco products. Id. § 1555-C(3)(C). Penalties are imposed only against the retailer for violations of this provision. See id. §§ 1555-C(3)(E)&(F).

### 2. § 1555-D

Section 1555-D makes it illegal for any person to knowingly deliver tobacco products to a Maine consumer if the products were purchased from an unlicensed retailer.[3] The section also states that a person delivering a package "is deemed to know"

---

[2]Tobacco products are broadly defined to include "any form of tobacco and any material or device used in the smoking, chewing, or other form of tobacco consumption, including cigarette papers and pipes." 22 M.R.S.A. § 1551(3).

[3]It does not, however, bar the delivery of tobacco products purchased from an unlicensed retailer to a licensed tobacco retailer or distributor operating in Maine. See id.

that the package contains tobacco products if it (1) so indicates on any side other than the side directly opposite the label, see Code of Me. R. ch. 203, § 11, or (2) was shipped by a person listed by the Attorney General as an unlicensed tobacco retailer.[4]

### C.    The Effect of the Tobacco Delivery Law on United Parcel Service (UPS)

As discussed in further detail below, one way for the associations to prove that the challenged provisions of the Tobacco Delivery Law are preempted by the FAAAA is to demonstrate that they have a forbidden significant effect on carrier services. See infra at 25. The associations have attempted to make this showing by highlighting the effect of the challenged provisions on UPS, a motor/air carrier of property operating in Maine.[5]

UPS, which delivers approximately 65,000 packages per day in Maine, offers door-to-door delivery service of packages and delivery of packages on an express basis. Its delivery operations function as an integrated system, requiring extensive planning and coordination among its operating facilities and ground and air fleet. Delays and disruptions in the sorting and delivery of

---

[4]The Attorney General maintains a list of unlicensed tobacco retailers that he distributes to carriers operating in Maine. 22 M.R.S.A. § 1555-D (2).

[5]While the associations rely on UPS' experience to prove that the Tobacco Delivery has a forbidden significant effect on carriers, UPS is not a party to this action.

packages can affect the timely delivery of thousands of packages within the UPS system.

Prior to the enactment of § 1555-C(3)(C), UPS did not require that its drivers deliver a package only to the addressee, and it did not require a signature from the recipient of the package unless the shipper paid a premium for this additional service. UPS determined that it would not be feasible to alter its delivery operations to provide these new services in Maine, so it stopped delivering all tobacco products to Maine consumers.

To make deliveries of tobacco products to licensed retailers and distributors in Maine as permitted by § 1555-D, UPS now has modified its uniform package delivery procedures to identify packages that contain tobacco products. UPS requires that its preloaders in Maine (the employees who place the packages on the trucks for delivery) specially examine each package to determine if it is marked as containing tobacco or if the name of the addressee or shipper indicates that the package likely contains tobacco.[6] Packages identified as likely containing tobacco products are then segregated so that UPS employees can research whether the package is destined for a licensed tobacco retailer or distributor. If UPS determines that the addressee is not a

_____

[6]UPS does not cross-reference packages against the Attorney General's list to determine if the shipper is listed as an unlicensed tobacco retailer.

licensed tobacco retailer or distributor, it arranges to return the package to the shipper or otherwise to dispose of the package.

###     D.        The District Court Decision

Proceeding from the premise that the FAAAA preempts a state law if it "expressly references" a carrier's prices, routes, or services or has a "forbidden significant effect" on the same, the district court concluded that the challenged provisions of the Tobacco Delivery Law are preempted by the FAAAA. See N.H. Motor Transp. Ass'n v. Rowe, 377 F. Supp. 2d 197, 210 (D. Me. 2005) (citing United Parcel Serv., Inc. v. Flores-Galarza, 318 F.3d 327, 334-35 (1st Cir. 2003) (UPS I)). The court determined that, while § 1555-C(3)(C) did not expressly reference carrier services because that section is directed only at retailers of tobacco products, it has a forbidden significant effect on UPS because, for the carrier to accept packages containing tobacco for delivery in Maine, it would have to adopt procedures that would "alter [its] delivery practices" for these packages.  Id. at 216.

The court also ruled that § 1555-D both expressly references and has a forbidden significant effect on carrier services. It concluded that the provision expressly references services because it prohibits carriers from delivering a certain class of tobacco products, i.e., tobacco products purchased by Maine consumers from unlicensed retailers. See id. at 211-12. It also concluded that the provision also has a forbidden significant

effect because it forced UPS to depart from "its nationally uniform procedure" by inspecting each package to identify the contents. Id. at 212. The Attorney General timely appealed from this ruling.[7]

## II.

### A.    Jurisdiction

Before reaching the merits of the Attorney General's appeal, we consider two threshold jurisdictional issues. The Attorney General asserts that the associations lack standing and that the action is moot in light of events occurring subsequent to the noticing of the appeal.

#### 1.    Standing

The associations invoke the representational standing doctrine recognized by the Supreme Court in Hunt v. Washington State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977). Under this doctrine, "an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individualized members in the lawsuit." Id.

---

[7]The district court found that another section of the Tobacco Delivery Law, which requires the shipper of tobacco products to inform the carrier of the age of the purchaser, was not preempted. Id. at 217 (citing 22 M.R.S.A. § 1555-C(3)(A)). The associations have not cross-appealed from this ruling.

The Attorney General focuses his argument on the third Hunt factor. He contends that evidence concerning the effect that the challenged provisions of the Tobacco Delivery Law have on UPS suffices only to justify preemption of the challenged provisions as to UPS. Preemption against other carriers should occur only to the extent that the other carriers individually prove that the challenged provisions have a forbidden significant effect on their prices, routes, or services.

The district court rejected this argument, observing that "[a]ssociational standing is . . . granted in cases seeking injunctive relief rather than damages, because individualized proof is not necessary and the relief usually inures to the benefit of all members injured." N.H. Motor Transp. Ass'n v. Rowe, 324 F. Supp. 2d 231, 236 (D. Me. 2004). Because the associations only sought an injunction and a declaratory judgment against the challenged provisions, the court ruled that the third Hunt factor was satisfied. See id. at 236 (citing Playboy Enters., Inc. v. Pub. Serv. Comm'n of P.R., 906 F.2d 25, 35 (1st Cir. 1990)).

After the district court issued this ruling, we clarified the requirements for establishing the third Hunt factor. In so doing, we acknowledged that "there is no well developed test in this circuit as to how the third prong of the Hunt test . . . applies in cases where injunctive relief is sought." Pharmaceutical Care Mgmt. Ass'n v. Rowe, 429 F.3d 294, 313-14 (1st

Cir. 2005). But we did not embrace the proposition that, under Playboy Enters. the third Hunt factor is always satisfied where an association seeks injunctive relief on behalf of all of its members. See Rowe, 429 F.3d at 314 ("Playboy is not an open door for association standing in all injunction cases where member circumstances differ and proof of them is important."). We concluded that representational standing is inappropriate if adjudicating the merits of an association's claim requires the court to engage in a "fact-intensive-individual inquiry." Id. (quoting Penn. Psychiatric Soc. v. Green Spring Health Servs., Inc., 280 F.3d 278, 287 (3d Cir. 2002)). We therefore turn to whether the associations' preemption claim requires a sufficiently fact-intensive inquiry to preclude representational standing.

The FAAAA provides that a state law is preempted if it relates to the prices, routes, or services of "any motor carrier" or "an air carrier." 49 U.S.C. §§ 14501(c) & 41713(b)(4)(A) (emphases supplied). "Any" means "one . . . of whatever kind," and "an" means "one." Merriam Webster's Collegiate Dictionary at 40, 53 (10th ed. 2001). The language of the FAAAA accordingly suggests that, if a state law is preempted as to one carrier, it is preempted as to all carriers.[8] See N.H. Motor Transp. Ass'n, 377

---

[8]Even if "an" as used in § 41713(b)(4)(A) is ambiguous, "any" as used in § 14501(c) is clear, and Congress has emphasized that these provisions were intended to "function in the exact same manner." H.R. Conf. Rep. 103-677 at 85, reprinted in 1994 U.S.C.C.A.N. at 1757.

-10-

F. Supp. 2d at 219.  Such a reading accords with one of the FAAAA's central purposes: to establish a "level playing field" among carriers.  H.R. Conf. Rep. 103-677 at 85, reprinted in 1994 U.S.C.C.A.N. at 1757; see Californians for Safe Dump Truck Transp. v. Mendonca, 152 F.3d 1184, 1187 (9th Cir. 1998).  If preemption were judged on a carrier-specific basis, the result would be a "patchwork" of state laws applying to some carriers and not to others, depending on which carriers proceeded to litigation.  H.R. Conf. Rep. 103-677 at 87 reprinted in 1994 U.S.C.C.A.N. at 1759. Such a result would undermine Congress' goal of encouraging uniformity in carrier regulation.  Thus, the associations can prevail by establishing that the challenged provisions of the Tobacco Delivery Law have a forbidden significant effect on one carrier.  The district court correctly ruled that the associations have standing to press their preemption claim.  See Rowe, 429 F.3d at 314.[9]

### 2.  Mootness

After the district court granted summary judgment, UPS settled an enforcement action brought by the New York Attorney

---

[9]The Attorney General also argues that representational standing should not be allowed because "the increased use of [representational] standing by large businesses [makes] the defense of suits . . . more difficult by controlling discovery and access to information."  We do not foreclose the possibility that representational standing may be improper in a particular case because of some hardship imposed on a defendant in conducting discovery.  But the Attorney General has not attempted to demonstrate such a hardship here.

General under a New York law restricting the ability of carriers to deliver cigarettes to consumers.  See N.Y. Pub. Health Law § 1399 - ll(2) (McKinney 2001).  In that settlement, UPS promised to stop "shipping cigarettes to individual consumers in the United States while still permitting lawful shipments of cigarettes to licensed tobacco businesses."  To fulfill this promise, UPS agreed (1) to identify all shippers that may be cigarette retailers and advise them that UPS will not accept cigarettes for delivery to consumers; (2) to discipline shippers that violate UPS's non-delivery policy; (3) to impose measures to ensure that employees "actively" look for indications that a package contains cigarettes; and (4) to instruct drivers not to deliver cigarette packages to consumers.

The Attorney General argues that, as a result of the settlement, this appeal has become moot, the judgment should be vacated and the case should be dismissed.  See Duke Power Co. v. Greenwood County, 229 U.S. 259, 267 (1936) (stating that where a case becomes moot while on appeal, the appellate court must set aside the judgment and remand the case with instructions that it be dismissed).  He contends that, by agreeing not to deliver cigarettes directly to consumers throughout the United States and directing employees actively to look for cigarettes, UPS is no longer affected by the Tobacco Delivery Law.

Article III considerations require that an actual case or controversy exist between the parties throughout the course of

-12-

litigation.  See Ramirez v. Sanchez Ramos, 438 F.3d 92, 100 (1st Cir. 2006).  A case must be dismissed as moot "if, at some time after the institution of the action, the parties no longer have a legally cognizable stake in the outcome." Goodwin v. C.N.J., Inc., 436 F.3d 44, 46 (1st Cir. 2006).  This rule applies even where the case becomes moot while pending on appeal.  See Great Western Sugar Co. v. Nelson, 442 U.S. 92, 93 (1979) (per curiam).  But "[t]he burden of establishing mootness rests squarely on the party raising it, and the burden is a heavy one."  Mangual v. Roger-Sabat, 317 F.3d 45, 60 (1st Cir. 2003) (citation omitted).  To establish mootness, the party raising it must show that the court cannot grant any "effectual relief whatever" to its opponent.  Church of Scientology of Cal. v. United States, 506 U.S. 9, 12 (1992).

The Attorney General has not met this heavy burden.  The New York settlement agreement applies only to the delivery of cigarettes,  but the Tobacco Delivery Law applies to "any form of tobacco and any material or device used in the smoking, chewing or other form of tobacco consumption."  22 M.R.S.A. § 1551-3.  UPS could therefore adhere to the terms of the settlement agreement and nevertheless violate the Tobacco Delivery Law by unlawfully delivering non-cigarette tobacco products.  Because enjoining the challenged provisions would permit UPS to deliver all tobacco products, effectual relief remains available.

## B.        Preemption

We turn now to the merits of the district court's preemption ruling.  We review the ruling de novo, considering the record and all reasonable inferences in the light most favorable to the Attorney General.  See Mullin v. Raytheon Co., 164 F.3d 696, 698 (1st Cir. 1999).  We may affirm on any ground revealed by the record.  See Houlton Citizens' Coalition v. Houlton, 175 F.3d 178, 183-84 (1st Cir. 1999).

The Attorney General presents two arguments for reversal. First, he contends that the FAAAA does not preempt state laws enacted pursuant to a state's police power to protect the health and welfare of its citizens.  The Attorney General asserts that the FAAAA preempts only state laws that impose traditional economic regulation on carriers -- e.g. entry and commodity controls, tariff filing requirements, and price ceilings.  Because the Tobacco Delivery Law does not impose such traditional economic restrictions, the Attorney General argues that the FAAAA does not apply.  Alternatively, the Attorney General contends that, even if the Act applies, neither challenged provision is "related to" carrier services within the meaning of the FAAAA.

### 1.    Applicability of the FAAAA to a State's Police-Power Enactments

A fundamental tenet of our federalist system is that constitutionally enacted federal law is supreme to state law. See U.S. Const. Art. VI. cl. 2.  As a result, federal law sometimes

-14-

preempts state law either expressly or by implication.  See Gade v. Nat'l Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 98 (1992). "Express preemption occurs when Congress has unmistakably . . . ordained that its enactments alone are to regulate a subject and state laws regulating that subject must fall."  Mass. Ass'n of Health Maintenance Organizations v. Ruthardt, 194 F.3d 176, 179 (1st Cir. 1999) (citation omitted).  In every preemption case, "the purpose of Congress is the ultimate touchstone." Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996).  The primary focus is on the "plain wording" of the statute because the text "contains the best evidence of Congress' pre-emptive intent." Sprietsma v. Mercury Marine, 537 U.S. 51, 62 (2002).  But "[a]lso relevant is the structure and purpose of the statute as a whole as revealed . . . through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers and the law." Medtronic, 518 U.S. at 486.[10]

---

[10]The parties devote a great deal of argument to whether we should conduct our preemption analysis with a presumption against preemption because the state law at issue was enacted to further Maine's police-power interest.  See Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947) (stating that a preemption analysis starts "with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress"). The circumstances in which the presumption is to apply are not altogether clear. Compare Medtronic, 518 U.S. at 485 (stating that the presumption against preemption applies "in all pre-emption cases") with United States v. Locke, 529 U.S. 89, 108 (2000) (holding the presumption inapplicable where "the State legislates in an area where there has

We begin with the text. As mentioned above, the FAAAA prohibits states from enacting laws "related to a price, route, or service" of a carrier. 49 U.S.C. §§ 14501(c) & 41713(b)(4)(A). This language was patterned after the preemption provision of the Airline Deregulation Act of 1978. See H.R. Conf. Rep. 103-677 at 85, reprinted in 1994 U.S.C.C.A.N. 1757, 1759; Mendonca, 152 F.3d at 1184; Desardouin v. United Parcel Serv., Inc., 285 F. Supp. 2d 153, 162 (D. Conn. 2003). Therefore, in addition to cases interpreting the FAAAA, we look to cases interpreting the Airline Deregulation Act. UPS I, 318 F.3d at 335-36; Mastercraft Interiors, Ltd. v. ABF Freight Sys., Inc., 284 F. Supp. 2d 284, 287 (D. Md. 2003).

The seminal case is Morales v. Trans World Airlines, Inc., 504 U.S. 374 (1992). Like the FAAAA, the version of the Airline Deregulation Act considered in Morales preempted state laws "relating to rates, routes or services of any air carrier."[11] The

_____

been a history of significant federal presence"). In any event, the presumption can be overcome where the congressional purpose is sufficiently clear. See Egelhoff v. Egelhoff 532 U.S. 141, 151 (2001). For the reasons discussed infra, we think that the congressional intent to preempt state police-power enactments that are related to carrier prices, routes, or services is sufficiently clear to overcome any presumption that would apply here.

[11]In 1994 Congress replaced "relating" with "related" and "rates" with "price" but did not intend these revisions to substantively change the law. See Pub. L. No. 103-272, § 1(a); 108 Stat. 745. This provision is currently codified at 49 U.S.C. § 41713(b)(1).

Court identified "relating to" as the key phrase in determining the breadth of the preemption provision and concluded that the "words . . . express a broad pre-emptive purpose." Id. at 383. It relied on several cases in which the Court had interpreted a similarly-worded provision of the Employment Retirement Security Act of 1974 (ERISA) preempting all state laws that "relate to" an employee benefit plan. Id. at 384. The Morales Court emphasized that this language had an "expansive sweep" and that it was "conspicuous for its breadth." Id. In light of Congress' use of similarly broad language, the Court concluded that Congress intended the Airline Deregulation Act to preempt any state law that has "a connection with or reference to airline rates, routes, or services." Id.

The FAAAA's drafters were familiar with Morales and approved of its reasoning. The Conference Committee Report explains that "the conferees [did] not intend to alter the broad preemption interpretation adopted by the United States Supreme Court in Morales . . . ." H.R. Conf. Rep. 103-677 at 83, reprinted in 1994 U.S.C.C.A.N. at 1755. The sweep of the FAAAA's text and the drafters' expressed intent to use Morales as a roadmap are strong evidence that the FAAAA was not intended to preempt only a narrow class of economic regulations while excluding the many laws enacted by the states under their police powers. If Congress had such a limited purpose in mind, it likely would have employed narrower language in fashioning the FAAAA preemption provisions.

<u>Cf.</u> <u>Botz</u> v. <u>Omni Air Int'l</u>, 286 F.3d 488, 493-94 (8th Cir. 2002) ("Although Congress could easily have selected more restrictive terminology to describe the type of . . . enactment the [Airline Deregulation Act] pre-empts, the provision as written is without language that would produce a more limited pre-emptive effect.").

The Attorney General argues that we should disregard <u>Morales</u> because, post-<u>Morales</u>, the Supreme Court has narrowed its understanding of ERISA's "relat[ing] to" language. We previously rejected this identical argument:

> The Secretary argues that the broad preemption standard adopted in <u>Morales</u> has been overruled by a number of Supreme Court cases narrowing the preemptive effect of [ERISA]. While the <u>Morales</u> Court undoubtedly took its interpretive cues from the ERISA preemption jurisprudence then in existence, it does not follow that any change in the ERISA law necessitates a parallel change in the law affecting . . . carriers. As Judge Easterbrook has put it: [I]f developments in pension law have under-cut holdings in air-transportation law, it is for the Supreme Court itself to make the adjustments. Our marching orders are clear: follow decisions until the Supreme Court overrules them.

<u>UPS I</u>, 318 F.3d at 335 n.19 (quoting <u>United Airlines, Inc.</u> v. <u>Mesa Airlines, Inc.</u>, 219 F.3d 605, 608 (7th Cir. 2000)). Absent extraordinary circumstances not present here, we are not at liberty to disregard this ruling. <u>See</u> <u>United States</u> v. <u>Wogan</u>, 938 F.2d 1446, 1449 (1st Cir. 1991) ("We have held, time and again, that in a multi-panel circuit, prior panel decisions are binding upon newly

-18-

constituted panels in the absence of supervening authority sufficient to warrant disregard of established precedent.").

We look also to the FAAAA's structure and legislative history. The FAAAA includes a series of exceptions to the general preemption rule. The excepted areas are:

> the safety regulatory authority of a State with respect to motor vehicles, the authority of a State to impose highway route controls or limitations based on the size or weight of the motor vehicle or the hazardous nature of the cargo, or the authority of a State to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization.

49 U.S.C. §§ 14501(c)(2) & 41713(b)(4)(B)(i). The Attorney General acknowledges that the challenged provisions of the Tobacco Delivery Law do not fall within any of these exceptions. He contends, however, that these statutory exceptions suggest broader congressional purpose to permit states to regulate carriers to protect citizen health and safety. The Attorney General points to a passage from the FAAAA's legislative history indicating that the enumerated exceptions were "not intended to be all inclusive," H.R. Conf. Rep. 103-677 at 84, reprinted in 1994 U.S.C.C.A.N. at 1756, to argue that we may establish an additional exception to FAAAA preemption for laws enacted pursuant to a state's police power to protect the health and welfare of its citizens.

We have cautioned that an overly broad interpretation of the FAAAA exceptions "would swallow the rule of preemption." United

Parcel Serv., Inc. v. Flores-Galarza, 385 F.3d 9, 14 (1st Cir. 2004) (UPS II). An exclusion from preemption for police-power enactments would surely "swallow the rule of preemption," as most state laws are enacted pursuant to this authority. Id. The exceptions preserving the states' authority to regulate motor vehicles do not support the Attorney General's argument. See id. (rejecting an argument that the FAAAA preemption exceptions indicate a congressional intent to preserve state authority over safety issues generally).

While the statute's structure does not support the Attorney General's police-power argument, there is some support in the legislative history for his view that the FAAAA preempts only state economic regulation. The Conference Committee Report observed that "[s]tate economic regulation of motor carriers . . . is a huge problem for national and regional carriers attempting to conduct a standard way of doing business." H.R. Conf. Rep. No. 103-677 at 85, reprinted in 1994 U.S.C.C.A.N. at 1757. The conferees identified "typical forms" of harmful regulation to include "entry controls, tariff filing, price regulation," and regulation of the "types of commodities carried." Id. at 1758. This history led the Supreme Court to remark that "the problem to which the [FAAAA] congressional conferees attended was state economic regulation." Columbus v. Ours Garage & Wreckers Serv., 536 U.S. 424, 440 (2002).

This history, however, does not indicate that preempting

economic regulation was the FAAAA's only purpose.  And, in any event,  the legislative history cannot trump the statute's text. See Cipollone v. Liggett Group, Inc., 505 U.S. 504, 521 (1992) (declining to adopt a limited interpretation of a preemption provision suggested by legislative history because "the language of the [cigarette labeling] Act plainly reaches" further); Morales, 504 U.S. at 385 n.2 (The "legislative history need not confirm the details of changes in the law effected by statutory language before we will interpret that language according to its natural meaning."). Congress often acts to address a specific problem but ultimately settles on a broader remedy.  See Penn. Dep't of Corr. v. Yeskey, 524 U.S. 206, 213 (1998) ("[T]he fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity.  It demonstrates breadth.").

In addition, the legislative history reveals a second goal for FAAAA preemption which is inconsistent with the Attorney's General argument: "to create a completely level playing field between air carriers . . . on the one hand and motor carriers on the other."  H.R. Conf. Rep. 103-677 at 85, reprinted in 1994 U.S.C.C.A.N. at 1757.  In other words, the conferees intended the scope of FAAAA and Airline Deregulation Act preemption to be coterminous. See Ace Auto Body & Towing Ltd. v. City of New York, 171 F.3d 765, 772 (2d Cir. 1999); Mendonca, 152 F.3d at 1187.

-21-

In the Airline Deregulation Act context, the Supreme Court has focused on the effect that a state law has on carrier operations, not on the state's purpose for enacting the law. In Morales, the Court found that the Airline Deregulation Act preempted a directive promulgated by several state attorneys general informing airlines that certain advertising practices would be considered to violate state consumer-protection laws. 504 U.S. at 379. And, in American Airlines, Inc. v. Wolens, 513 U.S. 219, 227-28 (1995), the Court held that the Airline Deregulation Act preempted a cause of action under the Illinois Consumer Fraud Act concerning the redemption of frequent-flier miles. In both cases, the Court's preemption analysis centered on the impact that the challenged state laws had on airline services and rates and not on the fact that the preempted laws were enacted pursuant to the states' police power to combat consumer fraud. See Fla. Lime & Avocado Growers v. Paul, 373 U.S. 132, 150 (1973) (describing the traditional state authority to pass laws to combat consumer fraud). The Court reached these conclusions over dissents by Justice Stevens arguing (similarly to the Attorney General here) that the state laws at issue should not be preempted because there was insufficient evidence of congressional intent to preempt state police-power enactments. See Am. Airlines, 513 U.S. at 235-31 (Steven, J. dissenting in part); Morales, 504 U.S. at 419-27 (Stevens, J., dissenting).

Morales and American Airlines thus teach that, under the Airline Deregulation Act, the focus should be on the effect that the state law has on airline operations. Accepting the Attorney General's argument would shift the analysis under the FAAAA away from that state law's effect and towards the state's purpose for enacting the law. A purpose-related limitation on FAAAA preemption would thus inevitably create a gap between the scope of FAAAA and Airline Deregulation Act preemption -- a gap which the FAAAA drafters sought to avoid.

In the end, the Attorney General's argument founders because it cannot be reconciled with the FAAAA's text. The Act's drafters chose to express the preemptive scope of the FAAAA in words that they understood to be exceedingly broad. In the preemption context, we are to give effect to the ordinary meaning of a congressional enactment "unless there is good reason to believe that Congress intended the language to have some more restrictive meaning." Cipollone, 505 U.S. at 521. We do not find a sufficiently compelling basis in either the structure or history of the FAAAA to interpret the Act contrary to its "deliberately expansive text." Morales, 504 U.S. at 384. We therefore conclude that the FAAAA preempts state police-power enactments to the extent that they are "related to" a carrier's prices, routes, or services.[12]

---

[12]The Attorney General offers a narrower argument for excluding from FAAAA preemption state laws intended to address underage smoking. He cites the Synar Amendment, a federal law conditioning

-23-

## 2. FAAAA Preemption of the Tobacco Delivery Law

We turn now to whether the challenged provisions of the Tobacco Delivery Law are preempted because they are "related to" carrier services.  The parties do not contest that carriers provide the service of delivering "packages on an express or time-guaranteed basis."  See N.H. Motor Transp. Ass'n, 377 F. Supp. 2d at 209 (quoting UPS I, 318 F.3d at 336).  But they disagree over whether the challenged provisions are "related to" this service.

We have previously interpreted the phrase "related to" as used in the FAAAA:

> The phrase "related to" has a broad meaning in ordinary usage: to stand in some relation; to have bearing or concern; to pertain; refer; to bring in association or connection with.  When used in a preemption provision, such as [in the FAAAA], it has a similarly broad reach.  State laws and regulations having a connection with or reference to a . . . carrier's . . . services are preempted under the [FAAAA].  A sufficient nexus exists if the law expressly references the . . . carriers' . . . services

---

the states' receipt of certain federal funds on their enacting laws to ban the sale of tobacco products to minors. See 42 U.S.C. § 300x-26.  The Attorney General contends that the Synar Amendment demonstrates Congress' intent that the states be able to regulate the delivery of tobacco products irrespective of the FAAAA.  We disagree.  The Synar Amendment indicates Congress' intent that the states take the lead in addressing the underage smoking problem.  But the Attorney General has not identified any evidence that Congress intended the states do so in derogation of other federal laws.  The FAAAA and Synar Amendment can exist harmoniously because the states may pass laws to curb underage smoking without passing laws "related to" carrier prices, routes, or services. See UPS I, 318 F.3d at 333-34 (stating that courts should endeavor to read congressional enactments in harmony whenever possible).

-24-

> or has a forbidden significant effect on the same.

UPS I, 318 F.3d at 335.  We therefore consider whether the district court correctly concluded that the challenged provisions of the Tobacco Delivery Law either expressly reference carrier services or have a forbidden significant effect on UPS' services.

We begin with § 1555-C(3)(C).  As set forth above, this statute requires tobacco retailers seeking to ship tobacco products directly to Maine consumers to use only carriers that deliver the package directly to the addressee/purchaser, require a signature from the addressee/purchaser, and conduct age verification if the addressee/purchaser is under 27 years of age.  Another section penalizes retailers that use carriers that do not provide these services.  22 M.R.S.A. §§ 1555-C(3)(E)&(F).

Section 1555-C(3)(C) expressly references a carrier's service of providing the timely delivery of packages.  The statute prescribes the method by which a carrier operating in Maine must deliver packages containing tobacco products in a way that would affect the ability of the carrier to meet package-delivery deadlines. Delays in searching for the purchaser, making multiple delivery attempts if the purchaser cannot be located, obtaining the purchaser's signature, and verifying the purchaser's age all could affect timely deliveries.  See UPS I, 318 F.3d at 336 (finding that the FAAAA preempted a state law that "affect[ed] the timeliness and

effectiveness" of a carrier's service).

The Attorney General responds that there is no FAAAA preemption because § 1555-C(3)(C) regulates retailers of tobacco products and not carriers. He also argues that we should decline to find preemption because any carrier can avoid the requirements of § 1555-C(3)(C) by declining to provide tobacco-product deliveries to Maine consumers.

The Attorney General's first argument amounts to a claim that there can be no FAAAA preemption unless the state law imposes a direct regulation on carriers. This argument cannot be squared with the FAAAA's text because it reads the broad phrase "related to" out of the statute and replaces it with the narrower term "regulates." See Morales, 504 U.S. at 385 (rejecting an argument that would have read "relating to" out of the Airline Deregulation Act and replaced it with "regulate"); UPS I, 318 F.3d at 335 (rejecting an argument for narrowing scope of the FAAAA that "would read 'the related to language' out of the statute").

Moreover, limiting preemption to direct regulation of carriers is inconsistent with the FAAAA's purpose to bar states from policing carrier operations. See Am. Airlines, 513 U.S. at 228. A state may use its coercive power to cause carriers to conform to state-imposed rules in at least two ways: it may directly regulate carriers or it may limit retailers to hiring only those carriers that comply with the state-imposed mandates. Either way the state

is employing its coercive power to police the method by which carriers provide services in the state. In short, the Attorney General's argument would lead to the untenable result of permitting states to regulate carrier services indirectly by regulating shippers. Cf. Abington Sch. Dist. v. Schemp, 374 U.S. 203, 230 (1963) (declining to adopt an interpretation that would permit states to do indirectly what they cannot do directly).

The Attorney General's alternative argument -- that there is no preemption because a carrier can forgo certain tobacco-product deliveries in Maine -- also fails. Declining to find preemption simply because a carrier can limit its in-state business to avoid a particular requirement would undermine the FAAAA's goal of creating an environment in which "[s]ervice options will be dictated by the marketplace," and not by state regulatory regimes. H.R. Conf. Rep. 103-677 at 88, reprinted in 1994 U.S.C.C.A.N. at 1760. The district court correctly concluded that the FAAAA preempts § 1555-C(3)(C).

We turn finally to whether the FAAAA preempts § 1555-D. In considering this question, we are mindful that courts should "not nullify more of a legislature's work than is necessary, for . . . a ruling of unconstitutionality frustrates the intent of the elected representative of the people." Ayotte v. Planned Parenthood of N. New England, 126 S. Ct. 961, 967 (2006) (internal citation omitted). The first part of §1555-D makes it unlawful for any person knowingly to deliver to Maine consumers certain contraband

tobacco products -- i.e., those tobacco products purchased by consumers from unlicensed retailers.  The second part of § 1555-D charges a carrier with knowledge that a package contains tobacco products if the package is so marked or if the shipper appears on the Attorney General's list of unlicensed tobacco retailers.

Under Maine law, tobacco products purchased by a consumer from an unlicensed retailer are contraband.  See 22 M.R.S.A. § 1555-C(7).  The first part of § 1555-D is a corollary to § 1555-C(7) in that it makes the knowing delivery of contraband tobacco products illegal.  Thus, the question we face is whether a generally applicable law barring any person from knowingly delivering contraband tobacco is preempted by the FAAAA insofar as the law pertains to carriers.

While the FAAAA's preemptive effect is broad, see UPS I, 318 F.3d at 335, it is not unlimited, see Mendonca, 152 F.3d at 1188.  State laws that only have a "tenuous, remote, or peripheral" relation to services are beyond the FAAAA's reach.  Morales, 504 U.S. at 390; Mendonca, 152 F.3d at 1188.  In describing this limitation on preemption in the Airline Deregulation Act context, the Supreme Court explained that its broad interpretation of the statute's preemption provision did not place it "on a road that leads to pre-emption of gambling and prostitution as applied to airlines."  Morales, 504 U.S. at 390.  We understand the Morales Court to have meant that states may continue to enjoy the power to

-28-

ban primary conduct, and that the ADA and FAAAA do not preempt laws applying these prohibitions to airlines and carriers.

Accordingly, Morales suggests that § 1555-D's ban on the knowing delivery of contraband tobacco products is not preempted by the FAAAA -- even only insofar as it pertains to carrier services. Section 1555-D requires that carriers do not act as knowing accomplices in the illegal sale of tobacco products. It does not, however, require that carriers modify their delivery methods other than by declining to transport a product that Maine has legitimately banned. We think that this effect on services is "too tenuous" to warrant preemption. Mendonca, 152 F.3d at 1189 (stating that a state law is too tenuous to be preempted by the FAAAA where the law does not frustrate the FAAAA's deregulatory purposes).

If the rule were otherwise, states would be unable to bar a primary method by which contraband crosses state lines. We do not believe that this was Congress' intent in enacting the FAAAA. Other courts applying the FAAAA to prohibitions on the delivery of contraband tobacco have reached similar conclusions. See Robertson v. Liquor Control Bd., 10 P.3d 1079, 1084-85 (Wash. App. Ct. 2000) (concluding that the FAAAA did not preempt a state law banning the transport of contraband cigarettes because otherwise "a motor carrier would be exempt from forfeiture for transporting a methamphetamine lab or poached game"); see also N.Y. State Motor Truck Ass'n v. Pataki, No. 03-CV-2386 (GBD), 2004 WL 2937803, at *6

-29-

(W.D.N.Y. Aug. 19, 2003) (concluding that the FAAAA did not preempt a state law making it unlawful for carriers to deliver cigarettes directly to New York consumers because "the mere fact that a statute concerns the transportation of a particular cargo by . . . carriers . . . does not render it . . . unconstitutional on preemption grounds"); Ward v. New York, 291 F. Supp. 2d 188, 210-211 (S.D.N.Y. 2004) (similar).[13]

But, while Maine may ban a carrier from knowingly transporting contraband tobacco products, it may not dictate the procedures that a carrier should employ to locate these products in its delivery chain. See UPS I, 318 F.3d at 336 (concluding that the FAAAA preempted a Puerto Rico revenue-collection scheme that mandated procedures that carriers had to follow to deliver certain packages). The second part of § 1555-D violates this principle.

As noted, § 1555-D imposes upon a carrier constructive

---

[13]There are many state laws barring the transport and delivery of contraband. E.g., Ala. Code § 2-14-5 (barring transport of certain products related to bee keeping); Ariz. Rev. Stat. § 3-209 (barring the transport of quarantined produce); Ariz. Rev. Stat. § 13-3102 (barring transport of prohibited weapons); Cal. Bus. & Prof. Code § 17533.9 (barring transport of tear gas); Cal. Fish & Game Code § 4800 (barring the transport of mountain lions); N.Y. Penal Law § 190.50 (barring transport of slot machines or other gambling devices). We have not a found a single case, outside the tobacco context, in which bans on the transport of contraband have been challenged as preempted by the FAAAA. Cf. Sir Arthur Conan Doyle, Silver Blaze (1890) (William S. Baring-Gould, ed., The Annotated Sherlock Holmes, Vol. II, 1967) (Detective Gregory: "'Is there any other point to which you would wish to draw my attention?" Sherlock Holmes: "To the curious incident of the dog in the night-time." Gregory: "The dog did nothing in the night-time." Holmes: "That was the curious incident.").

knowledge that it has delivered a tobacco product if the package containing the product is marked as containing tobacco or if the seller's name appears on the Attorney General's list. As UPS' experience demonstrates, a carrier seeking to comply with § 1555-D must specially inspect every package destined for delivery in Maine. Once the carrier has finished this inspection, it must segregate the packages that contain tobacco and research whether the addressee is a Maine-licensed retailer or distributor who can receive the package. While the second part of § 1555-D does not expressly reference carrier services, it "impermissibly affect[s] . . . services . . . because it requir[es] UPS to identify the contents of the packages (a deviation from standard procedures used in deliveries elsewhere in the United States). . . ." UPS II, 385 F.2d at 14 (parenthesis in original). UPS can only provide timely package delivery if it follows uniform procedures that allow for "an orderly flow of packages." UPS I, 318 F.3d at 336. Because the second part of § 1555-D has the effect of forcing UPS to change its uniform package-processing procedures, the district court correctly found it to be preempted.[14]

---

[14]The Attorney General argues that the associations have failed to establish a forbidden significant effect on UPS because they did not offer studies conducted by UPS on the cost of compliance. We agree with the district court that there is no such quantification requirement. The cases in this area have looked to the logical effect that a particular scheme has on the delivery of services or the setting of rates and have not required the presentation of empirical evidence. See N.H. Motor Transp. Ass'n, 377 F. Supp. 2d at 217 n. 92 (collecting cases).

In reaching this conclusion, we recognize that there is a potential tension between saying that, on the one hand, Maine is free to punish the knowing delivery of material that it has classified as contraband, while, on the other hand, ruling that it may not dictate or interfere with a carrier's delivery procedures. What we are saying here, however, is that Maine cannot use the mechanisms outlined in the statute to impute knowledge based on a failure to read labels or consult lists -- an imputation which would amount to prescribing how carriers must operate.

If, however, Maine could prove that a carrier employee had actual knowledge that a package being delivered was contraband tobacco, then it might have a colorable enforcement case -- although such circumstances, as a practical matter, may be difficult to prove. True, the "related to" language could stretch to such a case but it could also stretch to the knowing delivery of hard drugs -- and Congress cannot have intended such a result.

### III.

"[T]obacco use, particularly among children and adolescents, poses perhaps the single most significant public health problem in the United States." FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 161 (2000). There is no question that Maine has sought to achieve a worthy objective by passing the Tobacco Delivery Law to combat this pernicious problem. See N.H. Motor Transp. Ass'n, 377 F. Supp. 2d at 219. But the FAAAA focuses on the

-32-

effect that a state's law has on carriers, and not on the state's objective in passing the law. To the extent that Maine's Tobacco Delivery Law requires (or has the effect of requiring) carriers to implement state-mandated procedures in the processing and delivery of packages, it is preempted by the FAAAA. But to the extent that the Tobacco Delivery Law merely bars all persons (including carriers) from knowingly transporting contraband tobacco into Maine, the FAAAA is not implicated.

We **affirm** the judgment as it pertains to 22 M.R.S.A. § 1555-C(3)(C) and the second part of 22 M.R.S.A. § 1555-D but **reverse** the judgment as it pertains to the first part of § 1555-D. We **remand** the case to the district court with instructions to amend the judgment consistent with this opinion. No costs are awarded.

**So ordered**.