(Slip Opinion)            OCTOBER TERM, 2007            1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## ROWE, ATTORNEY GENERAL OF MAINE *v.* NEW HAMPSHIRE MOTOR TRANSPORT ASSOCIATION ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

No. 06–457.   Argued November 28, 2007—Decided February 20, 2008

Although a provision of the Federal Aviation Administration Authorization Act of 1994 forbids States to "enact or enforce a law . . . related to a price, route, or service of any motor carrier," 49 U. S. C. §14501(c)(1), see also §41713(b)(4)(a), Maine adopted a law which, *inter alia,* (1) specifies that a state-licensed tobacco shipper must utilize a delivery company that provides a recipient-verification service that confirms the buyer is of legal age, and (2) adds, in prohibiting unlicensed tobacco shipments into the State, that a person is deemed to know that a package contains tobacco if it is marked as originating from a Maine-licensed tobacco retailer or if it is received from someone whose name appears on an official list of *un*-licensed tobacco retailers distributed to package-delivery companies. In respondent carrier associations' suit, the District Court and the First Circuit agreed with respondents that Maine's recipient-verification and deemed-to-know provisions were pre-empted by federal law.

*Held:* Federal law pre-empts the two state-law provisions at issue. Pp. 3–11.

(a) In interpreting the 1994 federal Act, the Court follows *Morales* v. *Trans World Airlines, Inc.*, 504 U. S. 374, 378, in which it interpreted similar language in the pre-emption provision of the Airline Deregulation Act of 1978. Voiding state enforcement of consumer fraud statutes against deceptive airline-fare advertisements, *Morales* determined, *inter alia,* that the federal Act pre-empted state actions having a "connection with" carrier " ' rates, routes, or services,' " *id.,* at 384; that pre-emption may occur even if a state law has only an

indirect effect on rates, routes, or services, *id.,* at 386; and that pre-emption occurs at least where state laws have a "significant impact" related to Congress' deregulatory and pre-emption-related objectives, *id.,* at 390. The Court also emphasized that the airline Act's over-arching goal of helping assure that transportation rates, routes, and services reflects maximum reliance on competitive market forces, *id.,* at 378, and stated that federal law might not pre-empt state laws affecting fares only tenuously, remotely, or peripherally, but did not say where, or how, it would draw the line on "borderline" questions, *id.,* at 390. Pp. 3–5.

(b) In light of *Morales,* the Maine laws at issue are pre-empted. In regulating delivery service procedures, the recipient-verification provision focuses on trucking and similar services, thereby creating a direct "connection with" motor carrier services. See 504 U. S., at 384. It also has a "significant" and adverse "impact" in respect to the federal Act's ability to achieve its pre-emption-related objectives, *id.,* at 390, because it requires carriers to offer a system of services that the market does not now provide (and which the carriers would prefer not to offer). Even were that not so, the law would freeze into place services that carriers might prefer to discontinue in the future, thereby producing the very effect the federal law sought to avoid, *i.e.,* a State's direct substitution of its own governmental commands for "competitive market forces" in determining (to a significant degree) the services that motor carriers will provide. *Id.,* at 378. Maine's deemed-to-know provision applies yet more directly to motor carrier services by creating a conclusive presumption of carrier knowledge that a shipment contains tobacco in the specified circumstances. That presumption means that the law imposes civil liability upon the carrier, not simply for its knowing transport of (unlicensed) tobacco, but for the carrier's *failure sufficiently to examine every package.* The provision thus requires the carrier to check each shipment for certain markings and to compare it against the list of proscribed shippers, thereby directly regulating a significant aspect of the motor carrier's package pick-up and delivery service and creating the kind of state-mandated regulation that the federal Act pre-empts. Pp. 5–7.

(c) Maine's primary arguments for an exception from pre-emption—that its laws help prevent minors from obtaining cigarettes and thereby protect its citizens' public health—are unavailing. The federal law does not create a public health exception, but, to the contrary, explicitly lists a set of exceptions that do not include public health. See, *e.g.,* §§14501(c)(2) to (c)(3). Nor does its legislative history mention specific state enforcement methods or suggest that Congress made a firm judgment about, or even focused upon, the issue here. Maine's inability to find significant support for such an excep-

tion is not surprising, given the number of States through which carriers travel, the number of products carried, the variety of potential adverse public health effects, the many different kinds of regulatory rules potentially available, and the difficulty of finding a legal criterion for separating permissible from impermissible public-health-oriented regulations. Although federal law does not generally pre-empt state public health regulation, the state laws at issue are not general, their impact on carrier rates, routes, or services is significant, and their connection with trucking is not tenuous, remote, or peripheral: They aim directly at the carriage of goods, a commercial field where carriage by commercial motor vehicles plays a major role. From the perspective of pre-emption, this case is no more "borderline" than was *Morales.* Maine argues that to set aside its regulations will seriously harm its efforts to prevent minors from obtaining cigarettes, but the Solicitor General points to other legislative alternatives available to the State. Regardless, given *Morales'* holding that federal law pre-empts state consumer-protection laws, federal law must also pre-empt Maine's efforts directly to regulate carrier services. Pp. 7–11.

448 F. 3d 66, affirmed.

BREYER, J., delivered the opinion of the Court, in which ROBERTS, C. J., and STEVENS, KENNEDY, SOUTER, THOMAS, GINSBURG, and ALITO, JJ., joined, and in which SCALIA, J., joined in part. GINSBURG, J., filed a concurring opinion. SCALIA, J., filed an opinion concurring in part.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———————

No. 06–457

———————

## G. STEVEN ROWE, ATTORNEY GENERAL OF MAINE, PETITIONER *v.* NEW HAMPSHIRE MOTOR TRANSPORT ASSOCIATION ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

[February 20, 2008]

JUSTICE BREYER delivered the opinion of the Court.

We here consider whether a federal statute that prohibits States from enacting any law "related to" a motor carrier "price, route, or service" pre-empts two provisions of a Maine tobacco law, which regulate the delivery of tobacco to customers within the State. 49 U. S. C. §§14501(c)(1), 41713(b)(4)(A); see Me. Rev. Stat. Ann., Tit. 22, §§1555–C(3)(C), 1555–D (second sentence) (2004). We hold that the federal law pre-empts both provisions.

I

A

In 1978, Congress "determin[ed] that 'maximum reliance on competitive market forces'" would favor lower airline fares and better airline service, and it enacted the Airline Deregulation Act. *Morales* v. *Trans World Airlines, Inc.*, 504 U. S. 374, 378 (1992) (quoting 49 U. S. C. App. §1302(a)(4) (1988 ed.)); see 92 Stat. 1705. In order to "ensure that the States would not undo federal deregulation with regulation of their own," that Act "included a pre-emption provision" that said "no State . . . shall enact

or enforce any law . . . relating to rates, routes, or services of any air carrier." *Morales*, *supra*, at 378; 49 U. S. C. App. §1305(a)(1) (1988 ed.).

In 1980, Congress deregulated trucking. See Motor Carrier Act of 1980, 94 Stat. 793. And a little over a decade later, in 1994, Congress similarly sought to pre-empt state trucking regulation. See Federal Aviation Administration Authorization Act of 1994, 108 Stat. 1605–1606; see also ICC Termination Act of 1995, 109 Stat. 899. In doing so, it borrowed language from the Airline Deregulation Act of 1978 and wrote into its 1994 law language that says: "[A] State . . . may not enact or enforce a law . . . related to a price, route, or service of any motor carrier . . . with respect to the transportation of property." 49 U. S. C. §14501(c)(1); see also §41713(b)(4)(A) (similar provision for combined motor-air carriers).

The State of Maine subsequently adopted An Act To Regulate the Delivery and Sales of Tobacco Products and To Prevent the Sale of Tobacco Products to Minors, 2003 Me. Acts p. 1089, two sections of which are relevant here. The first section forbids anyone other than a Maine-licensed tobacco retailer to accept an order for delivery of tobacco. Me. Rev. Stat. Ann., Tit. 22, §1555–C(1). It then adds that, when a licensed retailer accepts an order and ships tobacco, the retailer must "utilize a delivery service" that provides a special kind of *recipient-verification* service. §1555–C(3)(C). The delivery service must make certain that (1) the person who bought the tobacco is the person to whom the package is addressed; (2) the person to whom the package is addressed is of legal age to purchase tobacco; (3) the person to whom the package is addressed has himself or herself signed for the package; and (4) the person to whom the package is addressed, if under the age of 27, has produced a valid government-issued photo identification with proof of age. *Ibid.* Violations are punishable by civil penalties. See §§1555–C(3)(E) to C(3)(F)

(first offense up to $1,500; subsequent offenses up to $5,000).

The second section forbids any person "knowingly" to "transport" a "tobacco product" to "a person" in Maine unless either the sender or the receiver has a Maine license. §1555–D. It then adds that a "person is *deemed to know* that a package contains a tobacco product" (1) if the package is marked as containing tobacco and displays the name and license number of a Maine-licensed tobacco retailer; or (2) if the person receives the package from someone whose name appears on a list of *un*-licensed tobacco retailers that Maine's Attorney General distributes to various package-delivery companies. *Ibid.* (emphasis added); see also §§1555–C(3)(B), 1555–D(1). Violations are again punishable by civil penalties. §1555–D(2) (up to $1,500 per violation against violator and/or violator's employer).

## B

Respondents, several transport carrier associations, brought this lawsuit in federal court, claiming that federal law pre-empts several sections of Maine's statute. The District Court held (among other things) that federal law pre-empts the portions of the two sections we have described, namely the "recipient-verification" provision (§1555–C(3)(C)) and the "deemed to know" provision (the second sentence of §1555–D). See 377 F. Supp. 2d 197, 220 (Me. 2005). On appeal, the Court of Appeals for the First Circuit agreed that federal law pre-empted the two provisions. 448 F. 3d 66, 82 (2006). We granted certiorari to review these determinations. 551 U. S. \_\_\_ (2007).

## II

### A

In *Morales*, this Court interpreted the pre-emption provision in the Airline Deregulation Act of 1978. See 504

U. S., at 378.  And we follow *Morales* in interpreting simi-
lar language in the 1994 Act before us here.  We have said
that "when judicial interpretations have settled the mean-
ing of an existing statutory provision, repetition of the
same language in a new statute indicates, as a general
matter, the intent to incorporate its judicial interpreta-
tions as well." *Merrill Lynch, Pierce, Fenner & Smith Inc.*
v. *Dabit*, 547 U. S. 71, 85 (2006) (internal quotation marks
and alterations omitted).  Here, the Congress that wrote
the language before us copied the language of the air-
carrier pre-emption provision of the Airline Deregulation
Act of 1978.    Compare 49 U. S. C. §§14501(c)(1),
41713(b)(4)(A), with 49 U. S. C. App. §1305(a)(1) (1988
ed.); see also H. R. Conf. Rep. No. 103–677, pp. 82–83, 85
(1994) (hereinafter H. R. Conf. Rep.).  And it did so fully
aware of this Court's interpretation of that language as set
forth in *Morales*.  See H. R. Conf. Rep., at 83 (motor carri-
ers will enjoy "the identical intrastate preemption of
prices, routes and services as that originally contained in"
the Airline Deregulation Act); *ibid.* (expressing agreement
with "the broad preemption interpretation adopted by the
United States Supreme Court in *Morales*"); *id.*, at 85.

In *Morales*, the Court determined: (1) that "[s]tate en-
forcement actions *having a connection with, or reference
to*" carrier "'rates, routes, or services' are pre-empted," 504
U. S., at 384 (emphasis added); (2) that such pre-emption
may occur even if a state law's effect on rates, routes or
services "is only indirect," *id.,* at 386 (internal quotation
marks omitted); (3) that, in respect to pre-emption, it
makes no difference whether a state law is "consistent" or
"inconsistent" with federal regulation, *id.,* at 386–387
(emphasis deleted); and (4) that pre-emption occurs at
least where state laws have a "significant impact" related
to Congress' deregulatory and pre-emption-related objec-
tives, *id.,* at 390.  The Court described Congress' overarch-
ing goal as helping assure transportation rates, routes,

and services that reflect "maximum reliance on competitive market forces," thereby stimulating "efficiency, innovation, and low prices," as well as "variety" and "quality." *Id.,* at 378 (internal quotation marks omitted). *Morales* held that, given these principles, federal law pre-empts States from enforcing their consumer-fraud statutes against deceptive airline-fare advertisements. *Id.,* at 391. See *American Airlines, Inc.* v. *Wolens*, 513 U. S. 219, 226–228 (1995) (federal law pre-empts application of a State's general consumer-protection statute to an airline's frequent flyer program).

Finally, *Morales* said that federal law might not pre-empt state laws that affect fares in only a "tenuous, remote, or peripheral . . . manner," such as state laws forbidding gambling. 504 U. S., at 390 (internal quotation marks omitted). But the Court did not say where, or how, "it would be appropriate to draw the line," for the state law before it did not "present a borderline question." *Ibid.* (internal quotation marks omitted); see also *Wolens, supra*, at 226.

B

In light of *Morales,* we find that federal law pre-empts the Maine laws at issue here. Section 1555–C(3)(C) of the Maine statute forbids licensed tobacco retailers to employ a "delivery service" unless that service follows particular delivery procedures. Me. Rev. Stat. Ann., Tit. 22, §1555–C(3)(C). In doing so, it focuses on trucking and other motor carrier services (which make up a substantial portion of all "delivery services," §1551(1–C)), thereby creating a direct "connection with" motor carrier services. See *Morales*, 504 U. S., at 384.

At the same time, the provision has a "significant" and adverse "impact" in respect to the federal Act's ability to achieve its pre-emption-related objectives. *Id.,* at 390. The Solicitor General and the carrier associations claim

(and Maine does not deny) that the law will require carriers to offer a system of services that the market does not now provide (and which the carriers would prefer not to offer). And even were that not so, the law would freeze into place services that carriers might prefer to discontinue in the future. The Maine law thereby produces the very effect that the federal law sought to avoid, namely, a State's direct substitution of its own governmental commands for "competitive market forces" in determining (to a significant degree) the services that motor carriers will provide. *Id.,* at 378 (internal quotation marks omitted).

We concede that the regulation here is less "direct" than it might be, for it tells *shippers* what to choose rather than *carriers* what to do. Nonetheless, the effect of the regulation is that carriers will have to offer tobacco delivery services that differ significantly from those that, in the absence of the regulation, the market might dictate. And that being so, "treating sales restrictions and purchase restrictions differently for pre-emption purposes would make no sense." *Engine Mfrs. Assn.* v. *South Coast Air Quality Management Dist.*, 541 U. S. 246, 255 (2004). If federal law pre-empts state efforts to regulate, and consequently to affect, the advertising *about* carrier rates and services at issue in *Morales,* it must pre-empt Maine's efforts to regulate carrier delivery services themselves.

Section 1555–D's "deemed to know" provision applies yet more directly to motor carrier services. The provision creates a conclusive presumption of carrier knowledge that a shipment contains tobacco when it is marked as originating from a Maine-licensed tobacco retailer or is sent by anyone Maine has specifically identified as an unlicensed tobacco retailer. That presumption means that the Maine law imposes civil liability upon the carrier, not simply for its knowing transport of (unlicensed) tobacco, but for the carrier's *failure sufficiently to examine every package.* The provision thus requires the carrier to check

each shipment for certain markings and to compare it against the Maine attorney general's list of proscribed shippers. And it thereby directly regulates a significant aspect of the motor carrier's package pick-up and delivery service. In this way it creates the kind of state-mandated regulation that the federal Act pre-empts.

Maine replies that the regulation will impose no significant additional costs upon carriers. But even were that so (and the carriers deny it), Maine's reply is off the mark. As with the recipient-verification provision, the "deemed to know" provision would freeze in place and immunize from competition a service-related system that carriers do not (or in the future might not) wish to provide. *Supra*, at 5–6. To allow Maine to insist that the carriers provide a special checking system would allow other States to do the same. And to interpret the federal law to permit these, and similar, state requirements could easily lead to a patchwork of state service-determining laws, rules, and regulations. That state regulatory patchwork is inconsistent with Congress' major legislative effort to leave such decisions, where federally unregulated, to the competitive marketplace. See H. R. Conf. Rep., at 87. If federal law pre-empts state regulation of the details of an air carrier's frequent flyer program, a program that primarily *promotes* carriage, see *Wolens*, *supra*, at 226–228, it must pre-empt state regulation of the essential details of a motor carrier's system for picking-up, sorting, and carrying goods— essential details of the carriage itself.

## C

Maine's primary arguments focus upon the *reason why* it has enacted the provisions in question. Maine argues for an exception from pre-emption on the ground that its laws help it prevent minors from obtaining cigarettes. In Maine's view, federal law does not pre-empt a State's efforts to protect its citizens' public health, particularly

when those laws regulate so dangerous an activity as underage smoking.

Despite the importance of the public health objective, we cannot agree with Maine that the federal law creates an exception on that basis, exempting state laws that it would otherwise pre-empt. The Act says nothing about a public health exception. To the contrary, it explicitly lists a set of exceptions (governing motor vehicle safety, certain local route controls, and the like), but the list says nothing about public health. See 49 U. S. C. §§14501(c)(2) to (c)(3); see also §41713(b)(4)(B). Maine suggests that the provision's history indicates that Congress' primary concern was not with the sort of law it has enacted, but instead with state "economic" regulation. See, *e.g.*, H. R. Conf. Rep., at 88; see also *Columbus* v. *Ours Garage & Wrecker Service, Inc.*, 536 U. S. 424, 440 (2002). But it is frequently difficult to distinguish between a State's "economic"-related and "health"-related motivations, see *infra*, at 9, and, indeed, the parties vigorously dispute Maine's actual motivation for the laws at issue here. Consequently, it is not surprising that Congress declined to insert the term "economic" into the operative language now before us, despite having at one time considered doing so. See S. Rep. No. 95–631, p. 171 (1978) (reprinting Senate bill).

Maine's argument for an implied "public health" or "tobacco" exception to federal pre-emption rests largely upon (1) legislative history containing a list of nine States, with laws resembling Maine's, that Congress thought did not regulate "intrastate prices, routes and services of motor carriers," see H. R. Conf. Rep., at 86; and (2) the Synar Amendment, a law that denies States federal funds unless they forbid sales of tobacco to minors, see 42 U. S. C. §§300x–26(a)(1), (b)(1). The legislative history, however, does not suggest Congress made a firm judgment about, or even focused upon, the issue now before us. And

the Synar Amendment nowhere mentions the particular state enforcement method here at issue; indeed, it does not mention specific state enforcement methods at all.

Maine's inability to find significant support for some kind of "public health" exception is not surprising. "Public health" does not define itself. Many products create "public health" risks of differing kind and degree. To accept Maine's justification in respect to a rule regulating services would legitimate rules regulating routes or rates for similar public health reasons. And to allow Maine directly to regulate carrier services would permit other States to do the same. Given the number of States through which carriers travel, the number of products, the variety of potential adverse public health effects, the many different kinds of regulatory rules potentially available, and the difficulty of finding a legal criterion for separating permissible from impermissible public-health-oriented regulations, Congress is unlikely to have intended an implicit general "public health" exception broad enough to cover even the shipments at issue here.

This is not to say that this federal law generally preempts state public health regulation: for instance, state regulation that broadly prohibits certain forms of conduct and affects, say, truckdrivers, only in their capacity as members of the public (*e.g.*, a prohibition on smoking in certain public places). We have said that federal law does not pre-empt state laws that affect rates, routes, or services in "too tenuous, remote, or peripheral a manner." *Morales*, 504 U. S., at 390 (internal quotation marks omitted). And we have written that the state laws whose "effect" is "forbidden" under federal law are those with a "*significant* impact" on carrier rates, routes, or services. *Id.,* at 388, 390 (emphasis added).

In this case, the state law is not general, it does not affect truckers solely in their capacity as members of the general public, the impact is significant, and the connec-

tion with trucking is not tenuous, remote, or peripheral. The state statutes aim directly at the carriage of goods, a commercial field where carriage by commercial motor vehicles plays a major role. The state statutes require motor carrier operators to perform certain services, thereby limiting their ability to provide incompatible alternative services; and they do so simply because the State seeks to enlist the motor carrier operators as allies in its enforcement efforts. Given these circumstances, from the perspective of pre-emption, this case is no more "borderline" than was *Morales. Id.,* at 390 (internal quotation marks omitted); see also *Wolens,* 513 U. S., at 226.

Maine adds that it possesses legal authority to prevent *any* tobacco shipments from entering into or moving within the State, and that the broader authority must encompass the narrower authority to regulate the *manner* of tobacco shipments. But even assuming purely for argument's sake that Maine possesses the broader authority, its conclusion does not follow. To accept that conclusion would permit Maine to regulate carrier routes, carrier rates, and carrier services, all on the ground that such regulation would not restrict carriage of the goods as seriously as would a total ban on shipments. And it consequently would severely undermine the effectiveness of Congress' pre-emptive provision. Indeed, it would create the very exception that we have just rejected, extending that exception to all other products a State might ban. We have explained why we do not believe Congress intended that result. *Supra*, at 7–10.

Finally, Maine says that to set aside its regulations will seriously harm its efforts to prevent cigarettes from falling into the hands of minors. The Solicitor General denies that this is so. He suggests that Maine, like other States, can prohibit all persons from providing tobacco products to minors (as it already has, see Me. Rev. Stat. Ann., Tit. 22, §1555–B(2) (Supp. 2007)); that it can ban all non-face-to-

face sales of tobacco; that it might pass other laws of general (non-carrier-specific) applicability; and that it can, if necessary, seek appropriate federal regulation (see, *e.g.*, H. R. 4081, 110th Cong., 1st Sess. (2007) (proposed bill regulating tobacco shipment); H. R. 4128, 110th Cong., 1st Sess., §§1411–1416, pp. 577–583 (2007) (proposed bill providing criminal penalties for trafficking in contraband tobacco)). Regardless, given *Morales,* where the Court held that federal law pre-empts state consumer-protection laws, we find that federal law must also pre-empt Maine's efforts directly to regulate carrier services.

For these reasons, the judgment of the Court of Appeals is affirmed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———————

No. 06–457

———————

## G. STEVEN ROWE, ATTORNEY GENERAL OF MAINE, PETITIONER *v.* NEW HAMPSHIRE MOTOR TRANSPORT ASSOCIATION ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

[February 20, 2008]

JUSTICE GINSBURG, concurring.

Today's decision declares key portions of Maine's Tobacco Delivery Law incompatible with the Federal Aviation Administration Authorization Act of 1994 (FAAAA). The breadth of FAAAA's preemption language, 49 U. S. C. §§14501(c)(1) and 41713(b)(4)(A), coupled with our decisions closely in point, *Morales* v. *Trans World Airlines, Inc.*, 504 U. S. 374 (1992), and *American Airlines, Inc.* v. *Wolens*, 513 U. S. 219 (1995), impel that conclusion. I write separately to emphasize the large regulatory gap left by an application of the FAAAA perhaps overlooked by Congress, and the urgent need for the National Legislature to fill that gap.

Tobacco use by children and adolescents, we have recognized, may be "the single most significant threat to public health in the United States." *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U. S. 120, 161 (2000). But no comprehensive federal law currently exists to prevent tobacco sellers from exploiting the underage market. Instead, Congress has encouraged state efforts. Congress has done so by providing funding incentives for the States to pass legislation making it unlawful to "sell or distribute any [tobacco] product to any individual under the age of 18." Synar Amendment, 106 Stat. 394, 42 U. S. C. §300x–

26(a)(1).  See *Lorillard Tobacco Co.* v. *Reilly*, 533 U. S. 525, 552, 571 (2001).

State measures to prevent youth access to tobacco, however, are increasingly thwarted by the ease with which tobacco products can be purchased through the Internet. "As cyberspace acts as a risk-free zone where minors can anonymously purchase tobacco, unrestricted online to-bacco sales create a major barrier to comprehensive youth tobacco control."  Brief for Tobacco Control Legal Consor-tium et al. as *Amici Curiae* 10 (footnote omitted).  See also Brief for California et al. as *Amici Curiae* 9 ("Illegal Inter-net tobacco sales have reached epidemic proportions.").

Maine and its *amici* maintain that, to guard against delivery of tobacco products to children, "the same sort of age verification safeguards [must be] used when tobacco is handed over-the-doorstep as . . . when it is handed over-the-counter." Brief for Petitioner 8; Brief for California et al. as *Amici Curiae* 11; Brief for Tobacco Control Legal Consortium et al. as *Amici Curiae* 11–12; cf. Brief for United States as *Amicus Curiae* 16.  The FAAAA's broad preemption provisions, the Court holds, bar States from adopting this sensible enforcement strategy.  While I join the Court's opinion, I doubt that the drafters of the FAAAA, a statute designed to deregulate the carriage of goods, anticipated the measure's facilitation of minors' access to tobacco.  Now alerted to the problem, Congress has the capacity to act with care and dispatch to provide an effective solution.

# SUPREME COURT OF THE UNITED STATES

———————

No. 06–457

———————

## G. STEVEN ROWE, ATTORNEY GENERAL OF MAINE, PETITIONER *v.* NEW HAMPSHIRE MOTOR TRANSPORT ASSOCIATION ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

[February 20, 2008]

JUSTICE SCALIA, concurring in part.

I join the opinion of the Court, except those portions (*ante*, at 4, 7, and 8) that rely on the reports of committees of one House of Congress to show the intent of that full House and of the other—with regard to propositions that are apparent from the text of the law, unnecessary to the disposition of the case, or both.