Opinion by Judge BERZON; Concurrence by Judge KLEINFELD.
OPINION
BERZON, Circuit Judge:
This case requires us to consider once more the circumstances under which claims brought under state law are preempted by federal statutes governing air transportation. See, e.g., Gilstrap v. United Air Lines, Inc., 709 F.3d 995 (9th Cir.2013); Charas v. Trans World Airlines, Inc., 160 F.3d 1259 (9th Cir.1998) (en banc).
Plaintiff-Appellants the National Federation of the Blind[1] and three blind individuals, Michael May, Michael Hingson, and Christina Thomas — collectively, “the Federation” — filed a class lawsuit against Defendant-Appellee United Airlines, Inc. (“United”), alleging that the airline’s policy of using automatic kiosks inaccessible to blind travelers violates California’s antidiscrimination laws. The district court dismissed the suit on the grounds that the Federation’s claims were expressly preempted under the Airline Deregulation Act of 1978 (“ADA”), 49 U.S.C. § 41713, and impliedly field preempted under the Air Carrier Access Act of 1986 (“ACAA”), *723 49 U.S.C. § 41705, and its implementing regulations, issued by the U.S. Department of Transportation (“DOT”). We affirm the district court on the basis of a regulation promulgated after its decision.
BACKGROUND
United owns and operates over 100 automatic ticketing kiosks in airports throughout California. These kiosks allow passengers to perform various functions relevant to their air travel, including accessing flight information, checking in for flights, printing boarding passes, checking baggage, and selecting and upgrading seats. As now configured, the kiosks require user responses to visual prompts on a computer touchscreen and so cannot be used without assistance by blind travelers. Although United could make its kiosks accessible to blind passengers using commercially available technologies such as audio interfaces and tactile keyboards, it has not.[2] As a result, blind passengers seeking to use United’s ticketing kiosks must either rely on the help of sighted relatives, friends, or strangers, or wait for a United agent to assist them. According to the Federation, United thereby “excludes the blind from full and equal access” to its kiosks.
The Federation sued United, seeking declaratory and injunctive relief as well as damages. Its complaint asserted that United’s policy of using kiosks inaccessible to the blind violates two California antidis-crimination statutes: the Unruh Civil Rights Act (“Unruh Act”) and the Disabled Persons Act (“DPA”). Cal. Civ.Code §§ 51, 54. The Unruh Act provides that “[a]ll persons within the jurisdiction of this state are free and equal, and no matter what their ... disability ... are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.” Id. § 51(b). The DPA guarantees persons with disabilities, including the blind, “full and equal access ... to accommodations, advantages, facilities, ... and privileges of all common carriers, airplanes, ... or any other ... modes of transportation.” Id. § 54.1(a)(1). These statutes, the Federation argues, require United to “take the steps necessary to make its [kjiosks readily accessible to and usable by blind individuals.”[3]
United moved to dismiss the Federation’s claims on three preemption grounds: (1) that the claims were preempted under the ADA’s express preemption provision, 49 U.S.C. § 41713(b)(1); (2) that the claims were impliedly preempted by the ACAA and its implementing regulations, including in particular an “interim” regulation governing kiosk accessibility, see Nondiscrimination on the Basis of Disability in Air Travel, 73 Fed.Reg. 27,614, 27,619 (May 13, 2008), which, according to United, pervasively regulated airport kiosk accessibility; and (3) that the Federation’s claims were impliedly preempted by the ACAA because they conflicted with the policy objectives reflected in the implementing regulations.[4]
After United filed its motion to dismiss, the district court requested the input of the United States and the DOT. The Unit *724 ed States filed a Statement of Interest maintaining that the Federation’s claims were preempted for all of the reasons cited by United. The district court subsequently issued an order granting United’s motion to dismiss, holding the Federation’s claims expressly preempted under the ADA and impliedly field preempted under the ACAA. This appeal followed.
The United States filed an amicus brief with this court, repeating its position that asserted state law claims are preempted. After oral argument, we vacated submission pending the Supreme Court’s resolution of Northwest, Inc. v. Ginsberg, — U.S.—, 134 S.Ct. 1422, 188 L.Ed.2d 538 (2014). While that case was pending, the DOT replaced the interim kiosk regulation with an extensive final rule. See Nondiscrimination on the Basis of Disability in Air Travel: Accessibility of Web Sites and Automated Kiosks at U.S. Airports, 78 Fed.Reg. 67,882 (Nov. 12, 2013). We ordered supplemental briefing on both developments, and the United States submitted an additional amicus brief, again maintaining that the claims are preempted.
DISCUSSION
Federal law may preempt state law in three ways. First, “Congress may withdraw specified powers from the States by enacting a statute containing an express preemption provision.” Arizona v. United States, — U.S. —, 132 S.Ct. 2492, 2500-01, 183 L.Ed.2d 351 (2012). Second, “States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance.” Id. at 2501. Finally, “state laws are preempted when they conflict with federal law,” such that “compliance with both federal and state regulations is a physical impossibility, ... [or] the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.” Id. (internal quotation marks and citation omitted).
Regardless of the type of preemption involved — express, field, or conflict— “[t]he purpose of Congress is the ultimate touchstone of pre-emption analysis.” Cipollone v. Liggett Grp., Inc., 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (alteration in original) (internal quotation marks omitted). In this regard, “we are mindful of the adage that Congress does not cavalierly preempt state law causes of action.” Montalvo v. Spirit Airlines, 508 F.3d 464, 471 (9th Cir.2007) (citing Medtronic, Inc. v. Lohr, 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996)). At the same time, we have recognized that “preemptive intent is more readily inferred” in the field of aviation, because it is “an area of the law where the federal interest is dominant.” Id. (citing Fidelity Fed. Sav. & Loan Ass’n v. de la Cuesta, 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982)).
In applying these principles to this case, our inquiry is a cabined one. The Federation’s claims were brought pursuant to California’s general antidiscrimination statutes. There is no California case law concerning the application of those statutes to airport kiosks. So we do not know at this point to what extent California law requires accessible kiosks or alternatives thereto. The issue at this juncture is thus whether any accessibility requirement for airport kiosks not required by the DOT regulations would be preempted.
With these background principles and caveats in mind, we consider whether the Federation’s claims are foreclosed by any of the three types of preemption.
*725 I. Express Preemption under the Airline Deregulation Act (“ADA”)[5]
A. Statutory Background
ADA § 41713(b)(1) provides that “a State ... may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this sub-part.” 49 U.S.C. § 41713(b)(1) (previously codified at 49 U.S.CApp. § 1305(a)(1)). It is this provision upon which United relies for its express preemption argument.
In determining the scope of § 41713(b)(1), we “start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.” Charas, 160 F.3d at 1265 (quoting Medtronic, 518 U.S. at 485, 116 S.Ct. 2240). To help determine Congress’s “manifest purpose,” we turn to the ADA’s history.
Before 1978, the Civil Aeronautics Board regulated interstate air transportation pursuant to the Federal Aviation Act of 1958 (“FAA”), Pub.L. No. 85-726, 72 Stat. 731 (1958), as amended, 49 U.S.CApp. § 1301 et seq. See Northwest, 134 S.Ct. at 1428. The FAA did not expressly preempt state regulation. See Morales v. Trans World Airlines, Inc., 504 U.S. 374, 378, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). Moreover, the FAA contained a “saving clause,” which provided that “[n]othing ... in this chapter shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies.” 49 U.S.CApp. § 1506 (1976) (recodified at 49 U.S.C. § 40120(c));[6] see also Morales, 504 U.S. at 378, 112 S.Ct. 2031. Thus, under the original statutory regime, states “were not prevented from enforcing their own laws, despite the economic effect on the airlines.” Charas, 160 F.3d at 1262.
In 1978, Congress, concluding that “efficiency, low prices, variety, and quality would be furthered by reliance on competitive market forces rather than pervasive federal regulation,” enacted the ADA as an amendment to the FAA. Id. (citing H.R. Conf. Rep. No. 95-1779, 95th Cong., 2d *726 Sess. 53 (1978)). “Congress’s ‘clear and manifest purpose’ ... was to achieve ... the economic deregulation of the airline industry ... [and] ‘to promote maximum reliance on competitive market forces.’ ” Id. at 1265 (quoting Am. Airlines, Inc. v. Wolens, 513 U.S. 219, 230, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995)) (internal quotation marks omitted). To prevent the states from “undoing] federal deregulation with regulation of their own,” Northwest, 134 S.Ct. at 1428 (quoting Morales, 504 U.S. at 378, 112 S.Ct. 2031) (internal quotation marks omitted), Congress included § 41713(b)(1) to expressly preempt state laws “related to a price, route, or service of an air carrier.” 49 U.S.C. § 41713(b)(1).[7]
B. United’s Kiosks Are Not “Services” under the ADA
The express preemption question in this case is whether the Federation’s state law claims are “related to” United’s “prices, routes, or services.” United contends that its kiosks are a “service” as that term is used in the ADA, and that the Federation’s Unruh Act and DPA claims are “related to a ... service of an air carrier,” rendering them preempted.[8] We disagree.
To begin, under the ADA as we have interpreted it, the term “service” “refer[s] to the prices, schedules, origins and destinations of the point-to-point transportation of passengers, cargo, or mail.” Charas, 160 F.3d at 1261. “Congress used ‘service’ in [§ 41713(b)(1) ] in the public utility sense — i.e., the provision of air transportation to and from various markets at various times,” and did not mean broadly to reach the various amenities provided by airlines, such as “in-flight beverages, personal assistance to passengers, the handling of luggage, and similar amenities.” Id. at 1266,1261.
Under our interpretation of § 41713(b)(1), the Federation’s claims do not relate to a “service” provided by United. First, kiosks are not “prices, schedules, origins [or] destinations of the point-to-point transportation of passengers, cargo, or mail.” Id. at 1261. Thus, to the extent they regulate kiosks, California’s antidiscrimination statutes regulate an amenity that United has chosen to provide, not “the provision of air transportation.” Id. at 1266.
Nor is it significant that kiosks facilitate services that relate to air transportation. As we noted in Charas, Congress did not intend “service” to refer to the “assistance to passengers in need, or like functions.” Id. at 1266. While they may be convenient for passengers, kiosks are not “services” in the “public utility sense.” See id.
Finally, Charas’s analysis of the term “service” is equally applicable to discrimination claims, so that a claim concerning the “service” of accommodating disabled passengers (or failing to do so) does not automatically trigger the express preemption provision. See Newman v. Am. Airlines, Inc., 176 F.3d 1128, 1131 (9th Cir.1999). In Newman, a blind passenger suf *727 fering from cancer and a heart condition was denied passage on the airline until she could provide a certificate from her doctor stating that it was safe for her to fly. Id. at 1130. The passenger sued the airline, alleging, inter alia, discrimination claims under California law. Id. We held that “[a]s used in a public utility sense, the term ‘service’ does not refer to alleged discrimination to passengers due to their disabilities.” Id. at 1131. For the same reason, the Federation’s accommodation claims do not come within the preemptive scope of § 41713(b)(1).
United and its supporting amici, the United States and the Air Transport Association of America (“ATAA”), do not really contest that, under Charas, the conclusion that the kiosks do not provide a “service” within the meaning of the ADA preemption provision is inescapable. Instead, they dispute Charas’s continuing vitality, maintaining that the Supreme Court overruled Charas in Rowe v. New Hampshire Motor Transport Ass’n, 552 U.S. 364, 128 S.Ct. 989, 169 L.Ed.2d 933 (2008), by adopting a different and broader definition of “service” than did Charas. Not so.
Rowe, applying a provision of the Motor Carrier Act modeled after § 41713(b)(1), held preempted a Maine statute that imposed a licensing and recipient-verification regime on retailers seeking to transport tobacco within the state. 552 U.S. at 370, 128 S.Ct. 989. Rowe concluded that the Maine statute was sufficiently related to “delivery services” to come within the scope of the Motor Carrier Act’s preemption provision. Id. at 371-72, 128 S.Ct. 989. Rowe’s understanding of the term “service” is entirely consistent with our decision in Charas.
Like Charas, Rowe viewed the term “service” as focused on “essential details of the carriage itself.” Id. at 373, 128 S.Ct. 989 (emphasis added). Far from being aimed at carriers’ amenities, the Maine tobacco law at issue in Rowe was “aim[ed] directly at the carriage of goods,” and “directly regulate[d] a significant aspect of the motor carrier’s package pickup and delivery service.” Id. at 376, 373, 128 S.Ct. 989. Most notably, the law mandated “particular delivery procedures” that affected how and to whom carriers could deliver tobacco. Id. at 371, 128 S.Ct. 989. In other words, the Maine law regulated “such things as ... the selection of markets to or from which transportation is provided.” Charas, 160 F.3d at 1265-66.
The Supreme Court recently confirmed Rowe’s focus on transportation services in Dan’s City Used Cars, Inc. v. Pelkey, — U.S. ——, 133 S.Ct. 1769, 1779, 185 L.Ed.2d 909 (2013). In that case, the Court held that claims brought under New Hampshire’s abandoned vehicle removal regime were not preempted under the same express preemption provision at issue in Rowe. Id. The Court again declined to articulate “an all-purposes definition of transportation ‘service[s].’ ” Id. (alteration in original). It emphasized, however, that unlike the tobacco delivery restrictions at issue in Rowe, New Hampshire’s abandoned vehicle laws had no connection to “transportation activities” — they merely addressed the “storage” of vehicles. Id. We conclude that Rowe is not inconsistent with Charas with respect to the definition of “service.”
We are mindful that some circuit courts have articulated broader constructions of the word “service” in ADA § 41713(b)(1) than the one we adopted in Charas.' See, e.g., Hodges v. Delta Airlines, Inc., 44 F.3d 334, 336 (5th Cir.1995) (en banc) (interpreting “services” to include “items such as ticketing, boarding procedures, provision of food and drink, and baggage handling, in addition to the transportation itself’); see also Bower v. Egyptair Airlines *728 Co., 731 F.3d 85, 94 (1st Cir.2013) (noting that the court had adopted the Hodges definition of “service”); Koutsouradis v. Delta Air Lines, Inc., 427 F.3d 1339, 1343 (11th Cir.2005) (same); Arapahoe Cnty. Pub. Airport Auth. v. F.A.A., 242 F.3d 1213, 1222 (10th Cir.2001) (citing the Hodges definition); Smith v. Comair, Inc., 134 F.3d 254, 259 (4th Cir.1998) (same); Travel All Over The World, Inc. v. Kingdom of Saudi Arabia, 73 F.3d 1423, 1433 (7th Cir.1996) (adopting the Hodges definition). But see Taj Mahal Travel, Inc. v. Delta Airlines, Inc., 164 F.3d 186, 194 (3d Cir.1998) (adopting the Charas definition of “service”). And in adopting broader interpretations of “service,” two Courts of Appeals have suggested that Rowe is inconsistent with our Charas definition. See Bower, 731 F.3d at 94 (citing DiFiore v. Am. Airlines, Inc., 646 F.3d 81, 88 & n. 9 (1st Cir.2011)); Air Transp. Ass’n of Am., Inc. v. Cuomo, 520 F.3d 218, 223 (2d Cir.2008).
We disagree with these other courts for the reasons we have explained. . In any event, Rowe is certainly not so “clearly irreconcilable” with Charas as to allow a three-judge panel to overrule a prior en banc decision of this court. See Miller v. Gammie, 335 F.3d 889, 900 (9th Cir.2003) (en banc). As we said in Dilts v. Penske Logistics, LLC: “Rowe did not represent a significant shift in [Motor Carrier Act] jurisprudence. Nor did it call into question our past [Motor Carrier Act] cases.” 769 F.3d 637, 645 (9th Cir.2014).
Nor is Northwest inconsistent with Charas. In the course of holding expressly preempted a claim in connection with a frequent flyer program, Northwest observed that:
Like the frequent flyer program in Wol-ens, the Northwest program is connected to the airline’s “rates” because the program awards mileage credits that can be redeemed for tickets and upgrades. See [Wolens,] 513 U.S.[] at 226 [115 S.Ct. 817]. When miles are used in this way, the rate that a customer pays, i.e., the price of a particular ticket, is either eliminated or reduced. The program is also connected to “services,” i.e., access to flights and to higher service categories. Ibid.
Northwest, 134 S.Ct. at 1431.
The relevant portion of Northwest was a direct application of Wolens, not a shift in the Supreme Court’s interpretation of the ADA preemption provision.[9] Like Wolens, Northwest addressed a frequent-flyer program. Id. Northwest concluded that the program was connected to both rates and services for exactly the same reasons given in Wolens. See id.; Wolens, 513 U.S. at 226, 115 S.Ct. 817. The discussion does not clarify whether aspects of air travel other than frequent-flyer programs, such as ticket kiosks, fall within the scope of the preemption clause.
United and the United States argue, however, that Northwest “underscores” that “the Supreme Court had already superseded this Court’s airline ‘services’ interpretation [in Charas ] with a controlling classification of its own.” But Wolens was decided before Charas. So, even if Charas was wrongly decided, Wolens would not give this panel the authority to revisit it. Miller, 335 F.3d at 900. And, since the relevant portion of Northwest simply applies Wolens, it similarly does not give this panel the authority to disregard Charas. Id. Accordingly, we hold that United’s *729 kiosks do not qualify as a “service” within the meaning of ADA § 41713(b)(1).
Moreover, our conclusion, based on Charas, that United’s kiosks fall outside the statutory definition of “services” is consistent with the ADA’s deregulatory purpose. In enacting the ADA, Congress primarily sought to “utilize competition and market forces to achieve regulatory goals, such as low-cost, efficient air transportation.” H.R.Rep. No. 95-1779, at 55 (1978) (Conf.Rep.); see also Charas, 160 F.3d at 1262-63. But, as Charas stated, “[njothing in the Act itself, or its legislative history, indicates that Congress had a ‘clear and manifest purpose’ to displace” state laws “that do not affect deregulation in more than a ‘peripheral manner.’ ” Charas, 160 F.3d at 1265 (quoting Morales, 504 U.S. at 390, 112 S.Ct. 2031). Instead, “when Congress enacted federal economic deregulation of the airlines, it intended to insulate the industry from possible state economic regulation as well.” Id. at 1266.
United does not argue that the Federation’s claims, if accepted, would frustrate the goals of airline deregulation. Nor has it demonstrated that the claims would have a significant effect on any of those airline services that are covered by the ADA preemption provision. See Montalvo, 508 F.3d at 475; Martin ex rel. Heckman v. Midwest Exp. Holdings, Inc., 555 F.3d 806, 810 (9th Cir.2009).
For all these reasons, the Federation’s claims are not expressly preempted under the ADA.
II. Implied Preemption under the Air Carrier Access Act (“ACAA”)
A. Statutory and Regulatory Background
We recently explained the background of the ACAA:
The ACAA is an amendment to the [FAA]. The original FAA, passed in 1958, included a requirement that air carriers not “subject any particular person ... to any unjust discrimination or any undue or unreasonable prejudice or disadvantage in any respect whatsoever.” 49 U.S.CApp. § 1374 (1982), repealed by Pub.L. No. 103-272, 108 Stat. 745, 1141 (1994). This requirement was repealed by the [ADA], leaving passengers with disabilities without express protection against discrimination by commercial airlines. See Shinault v. Am. Airlines, Inc., 936 F.2d 796, 802 (5th Cir.1991).
A different statute, § 504 of the Rehabilitation Act of 1973[,] provides generally that individuals with disabilities may not be excluded from or discriminated against by federally-funded programs. See U.S. Dep’t of Transp. v. Paralyzed Veterans of Am., 477 U.S. 597, 599 [106 S.Ct. 2705, 91 L.Ed.2d 494] (1986). In 1979, the Civil Aeronautics Board ... promulgated regulations applying § 504 to those commercial airlines that received direct federal subsidies. Organizations representing individuals with disabilities ... challenged those regulations, seeking to apply § 504 to all commercial airlines, on the ground that airlines not receiving direct federal subsidies were indirect recipients of federal funding for airport construction and for the federally operated air traffic control system. The Supreme Court rejected [that] argument[ ], holding that commercial airlines were ... not “recipients[ ]” of federal [financial assistance]. Id. at 607, 611 [106 S.Ct. 2705].
Gilstrap, 709 F.3d at 999 (some alterations in original) (footnote and some citations omitted).
Congress responded to Paralyzed Veterans by passing the ACAA as an amend *730 ment to the FAA. Id. at 1000. The current version of the ACAA provides that “an air carrier .... may not discriminate against an otherwise qualified individual” on the ground that “the individual has a physical or mental impairment that substantially limits one or more major life activities.” 49 U.S.C. § 41705(a)(1). The Secretary of Transportation is authorized’ to promulgate regulations implementing the ACAA under § 40113(a) of the FAA, id. § 40113(a), and:
Pursuant to that authorization, the [DOT] issued regulations, codified at 14 C.F.R. Part 382, specifying the detailed requirements that airlines must meet to comply with the ACAA. The regulations impose four general duties on air carriers: “not [to] discriminate against any qualified individual with a disability, by reason of such disability, in the provision of air .transportation”; “not [to] require a qualified individual with a disability to accept special services ... that the individual does not request”; “not [to] exclude a qualified individual with a disability from or deny the person the benefit of any air transportation or related services that are available to other persons,” with certain limited exceptions; and “not [to] take any adverse action against an individual (e.g., refusing to provide transportation) because the individual asserts, on his or her own behalf or through or on behalf of others, rights protected” by the regulations or the ACAA. 14 C.F.R. § 382.11(a).
Gilstrap, 709 F.3d at 1000-01 (all but first alteration in the original).
B. Implied Field Preemption

1. The Federal Aviation Act’s Saving Clause

Before we consider whether the Federation’s claims are impliedly field preempted by the ACAA and its implementing regulations, we must first address the Federation’s assertion that implied field preemption is “not permitted” under the ACAA. Specifically, the Federation argues that its state-law claims cannot be impliedly field preempted under the ACAA because of the combined effect of the FAA’s saving clause and the express preemption clause of the ADA. According to the Federation, any state-law claims that fall outside the scope of the ADA express preemption provision are necessarily preserved by the FAA’s saving clause. That is not so.
The saving clause provides that “[a] remedy under this part is in addition to any other remedies provided by law.” 49 U.S.C. § 40120(c).[10] The clause was enacted, as part of the original Federal Aviation Act of 1958; it remained unchanged when Congress enacted the ADA in 1978 and the ACAA in 1986. Congress retained once more the saving clause when it reorganized the FAA in 1994. See Revision of Title 49, United States Code Annotated, “Transportation,” Pub.L. No. 103-272, 108 Stat. 745 (1994).
The Federation maintains that if Congress had wanted to preempt state discrimination claims, it could have done so explicitly in the ADA express preemption provision, 49 U.S.C. § 41713(b)(1). Because Congress did not do so, the Federation’s argument goes, “the [FAA] savings clause springs into operation once it is determined that a claim is not expressly preempted ... [and] preserves those claims from field preemption.”
We are unpersuaded, for several reasons. First, by its terms, the FAA’s saving clause preserves only “other remedies *731 provided by law,” 49 U.S.C. § 40120(c) (emphasis added), not claims brought under state statutes prescribing substantive standards of care. See Northwest, 134 S.Ct. at 1428 (describing § 40120(c) as “a saving provision preserving pre-existing statutory and common-law remedies ”) (emphasis added); Morales, 504 U.S. at 385, 112 S.Ct. 2031 (describing § 40120(c) as a “general ‘remedies’ saving clause”) (emphasis added); Ventress v. Japan Airlines, 747 F.3d 716, 723 n. 7 (9th Cir.2014) (“The FAA’s savings clause ... establishes] that state law remedies remain available____”) (emphasis added); Gilstrap, 709 F.3d at 1005-06; see also U.S. Airways, Inc. v. O’Donnell, 627 F.3d 1318, 1326 (10th Cir.2010). In this case, the Federation seeks relief under “prescriptive” state statutes that “eontrol[ ] the primary conduct of those falling within [their] governance.” Wolens, 513 U.S. at 227,115 S.Ct. 817. It does not, as in Gilstrap, seek to use a state-law remedy for a breach of a federally prescribed standard of behavior. See Gilstrap, 709 F.3d at 1007.
The Federation relies on the statement in Brown v. United Airlines, Inc., a First Circuit ease, that “when the [ADA] saving clause is juxtaposed with the [ADA express] preemption provision it ‘ought properly be read to carve out all common law or statutory claims not related to an airline’s prices, routes or services.’ ” 720 F.3d 60, 69 (1st Cir.2013) (quoting Mitchell v. U.S. Airways, Inc., 858 F.Supp.2d 137,154 (D.Mass.2012)). But Brown held, in relevant part, only that common-law claims could be preempted by the ADA’s express preemption provision, and that the plaintiffs’ claims were in fact preempted. Id. at 69, 71. Implied preemption was not at issue in Brown at all. Nor is there any reason to think that Brown’s statement that claims not falling within the express clause are carved out by the saving clause was intended to refer to implied preemption.
Moreover, in general, the inclusion of either a saving clause or an express preemption clause within a statutory scheme does not foreclose the application of ordinary implied preemption principles. “[T]he existence of an ‘express pre-emption provisio[n] does not bar the ordinary working of conflict pre-emption principles’ or impose a ‘special burden’ that would make it more difficult to establish the preemption of laws falling outside the clause.” Arizona, 132 S.Ct. at 2504-05 (quoting Geier v. Am. Honda Motor Co., 529 U.S. 861, 869-72, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000)). That the Federation’s claims are not expressly preempted under the ADA, therefore, does not “categorically] ... preclude” implied preemption under the ACAA. Freightliner Corp. v. Myrick, 514 U.S. 280, 288, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995).
The presence of a saving clause does not necessarily limit the operation of ordinary implied preemption principles either. Geier is instructive in this regard. That case concerned preemption under the National Traffic and Motor Vehicle Safety Act of 1966 (“Safety Act”), 15 U.S.C. § 1381 (1988), repealed by Pub.L. No. 103-272, § 7(b), 108 Stat. 1379 (1994). 529 U.S. at 867, 120 S.Ct. 1913. The Safety Act had a saving clause, which provided that “Compliance with’ a federal safety standard ‘does not exempt any person from any liability under common law.’ ” Id. at 868, 120 S.Ct. 1913 (quoting 15 U.S.C.' § 1397(k) (1988)). Geier explained that neither the Safety Act’s saving clause nor its express preemption clause[11] “fore *732 closefd] or limit[ed] the operation of ordinary preemption principles insofar as those principles instruct us to read statutes as pre-empting state laws ... that ‘actually conflict’ with the statute or federal standards promulgated thereunder.” Id. at 869, 120 S.Ct. 1913; see also Williamson v. Mazda Motor of Am., Inc., 562 U.S. 323, 131 S.Ct. 1131, 1136,179 L.Ed.2d 75 (2011) (holding that a statute’s saving clause did not “foreclose or limit the operation of ordinary conflict preemption principles”). Geier emphasized that the Court “ha[d] repeatedly ‘decline[d] to give broad effect to saving clauses where doing so would upset the careful regulatory scheme established by federal law.’ ” Id. at 870, 120 S.Ct. 1913 (quoting United States v. Locke, 529 U.S. 89, 106, 120 S.Ct. 1135, 146 L.Ed.2d 69 (2000)).
As Geier then went on to explain, the presence of both a saving clause and an express preemption clause in the Safety Act does not “create some kind of ‘special burden’ beyond that inherent in ordinary pre-emption principles.” Id. at 870, 120 S.Ct. 1913. Although the saving and preemption clauses reflected seemingly conflicting congressional objectives, Geier declined to interpret the Safety Act’s saving clause as preserving all claims brought under state law that did not fall within the preemption provision’s scope, noting that “[t]o the extent that such an interpretation of the saving provision reads into a particular federal law toleration of a conflict that [ordinary conflict preemption] principles would otherwise forbid, it permits that law to defeat its own objectives.” Id. at 872, 120 S.Ct. 1913. Permitting common-law actions that “actually conflict” with federal regulations “would take from those who would enforce a federal law the very ability to achieve the law’s congressionally mandated objectives that the Constitution, through the operation of ordinary preemption principles, seeks to protect.” Id.
Geier concerned only the operation of ordinary implied conflict preemption principles. But the same logic applies to the operation of implied field preemption principles. Compare Arizona, 132 S.Ct. at 2504-05 (relying on Geier) with id. at 2520 (Scalia, J., concurring in part and dissenting in part) (arguing that Geier was inapplicable because it applied conflict preemption principles, while the majority relied on field preemption). To interpret § 40120(c) as preserving any state-law claim not preempted under the ADA — including claims involving areas pervasively regulated by the DOT, such that Congressional intent to “occupy a field exclusively” would otherwise be inferred, Freightliner, 514 U.S. at 287, 115 S.Ct. 1483 — would allow the FAA to “defeat its own objectives.” Geier, 529 U.S. at 872, 120 S.Ct. 1913. The FAA expressly authorizes the DOT to promulgate “necessary” regulations to carry out the ACAA. 49 U.S.C. §§ 40101, 40113. In fact, it was the need for a “uniform and exclusive system of federal regulation” that led Congress to enact the FAA in the first place. See Montalvo, 508 F.3d at 471. Under the Federation’s reading of § 40120(c), however, a passenger could sue an airline for violating any state standard of care not expressly preempted by the ADA, notwithstanding federal regulations covering in depth the particular field at issue. The result would be chaotic. *733 A federal regulatory scheme designed to determine entirely the rights and obligations of affected parties as to particular issues could then coexist with another set of comprehensive regulations covering the same area, as long as there was no direct conflict between the two. Yet, comprehensive regulatory schemes often represent considered decisions to refrain from mandating certain actions or protections, while at the same time allowing those same actions or protections if undertaken voluntarily.
There is little reason to think Congress, in retaining the FAA’s saving clause, intended to create “such a complex type of state/federal relationship” as would result if two sets of comprehensive schemes of this sort were allowed to coexist. Geier, 529 U.S. at 872, 120 S.Ct. 1913. Absent any specific indication that Congress sought to preserve all state-law claims not expressly preempted under the ADA, we adopt the Geier approach and so apply ordinary implied field preemption principles to the Federation’s claims.

2. The Regulatory Field

Under those principles, “state law is pre-empted ... if federal law so thoroughly occupies a legislative field ‘as to make reasonable the inference that Congress left no room for the States to supplement it.’ ” Cipollone, 505 U.S. at 516, 112 S.Ct. 2608 (quoting de la Cuesta, 458 U.S. at 153, 102 S.Ct. 3014); see also Freightliner, 514 U.S. at 287, 115 S.Ct. 1483. In determining field preemption, “[flederal regulations have no less preemptive effect than federal statutes.” de la Cuesta, 458 U.S. at 153, 102 S.Ct. 3014. Accordingly, “[w]here ... Congress has entrusted an agency with the task of promulgating regulations to carry out the purposes of a statute, as part of the preemption analysis we must consider whether the regulations evidence a desire to occupy a field completely.” Montalvo, 508 F.3d at 470-71 (quoting R.J. Reynolds Tobacco Co. v. Durham Cnty., 479 U.S. 130, 149, 107 S.Ct. 499, 93 L.Ed.2d 449 (1986)) (alteration in original). In particular, we “look[ ] to the pervasiveness of federal regulations in the specific area covered by the ... state law at issue.” Martin, 555 F.3d at 809; see also Ventress, 747 F.3d at 721. If the pervasiveness of the regulations indicate that the agency sought to occupy the field, we ask only “whether that action [wa]s within the scope of the [agency’s] delegated authority.” de la Cuesta, 458 U.S. at 154,102 S.Ct. 3014.
With respect to accessibility of airport kiosks, DOT has promulgated two regulations. First, on May 13, 2008, DOT promulgated an “interim” rule, requiring, without significant further elaboration, that if kiosks are inaccessible, the airline must provide “equivalent service.” 14 C.F.R. § 382.57 (2008); see also 73 Fed. Reg. at 27,619-20.[12] After oral argument in this case, DOT replaced that brief interim rule with a much more extensive and detailed one, addressing a wide variety of accessibility, technical, and timing requirements specifically applicable to airport kiosks (the “new regulation”). See 14 C.F.R. § 382.57 (2014); 78 Fed.Reg. at 67,900-11.
Applying our precedents concerning field preemption, we conclude, *734 first, that the DOT ACAA regulations covering matters other than the use of airline ticketing kiosks are not pertinent to our field preemption inquiry; second, that the new regulation is pervasive and intended to occupy the field of kiosk accessibility; and, third, that DOT acted within its delegated authority in promulgating the new regulation..
The essential field preemption inquiry is whether the density and detail of federal regulation merits the inference that any state regulation within the same field will necessarily interfere with the federal regulatory scheme. The first step in determining whether that situation exists is to delineate the pertinent regulatory field; the second is to survey the scope of the federal regulation within that field.
In Martin, 555 F.3d 806, for example, a pregnant passenger who had fallen on an airplane’s stairway, injuring herself and her fetus, alleged that the airstairs were “defectively designed because they had only one handrail.” Id. at 808. The “only [DOT] regulation on airstairs,” we noted, provided that “they can’t be designed in way that might block the emergency exits”; the regulation had “nothing to say about handrails, or even stairs at all, except in emergency landings.” Id. at 812. We concluded that “[b]ecause the agency [had] not comprehensively regulated air-stairs, the FAA [had] not preempted state law claims that the stairs are defective.” Id. In so ruling, we emphasized the importance of delineating the pertinent area of regulation with specificity before proceeding with the field preemption inquiry: “[W]hen [an] agency issues ‘pervasive regulations’ in an area ... the [statute] preempts all state law claims in that area.” Id. at 811. But, “[i]n areas without pervasive regulations ... the state standard of care remains applicable.” Id.[13]
The current version of § 382.57 does pervasively regulate the accessibility of airport kiosks. That regulation, appended to this opinion, is exhaustive. With regard to blind travelers, the rule specifies, among many other matters, the following technical and design requirements for accessible airport kiosks:
(1) “Automated airport kiosks must provide an option for speech output,” and meet specified requirements concerning the content, volume, and privacy restrictions on that output, id. § 382.57(c)(5)(i)-(ii);[14] and (2) “[a]t least one input control that is tactilely discernible without activation must be provided for each function,” and meet specified requirements regarding the arrangement and *735 tactile indication required, id. § 382.57(c)(6).[15]
The regulation also requires that the kiosk’s “[o]perable parts must be tactilely discernible without activation,” id. § 382.57(c)(3)(i) and that “Braille instructions for initiating the speech mode must be provided.” Id. § 382.57(c)(8). Finally, the regulation imposes a backup requirement of “equivalent service,” similar to the general accommodation language that appeared in the interim rule. Id. § 382.57(d).[16]
The new regulation thus informs airlines with striking precision about the attributes their accessible kiosks must have. In doing so, the new regulation speaks directly to the concerns raised by the Federation’s suit.
In its complaint, the Federation alleged that, because United’s kiosks “use exclusively visual computer screen prompts and touch-screen navigation to guide a customer through a transaction without translating the prompts into a medium accessible to the blind, such as audio output[,] ... vision is required to successfully use” the kiosks. Furthermore, the Federation alleged, “[technology exists for United’s [k]iosks to be accessible to the blind, including but not limited to an audio interface, a tactile keyboard, and/or interactive screen reader technology for use with touch screens.”
The new regulation instructs United exactly what it must do to address this problem, from the general — namely that its accessible kiosks must, as the Federation suggests, incorporate both speech output and at least one tactile input method — to the granularly specific, including the specific decibel levels for speech output and the particular tactile symbols to be used. Thus, “a number of specific federal [regulatory provisions] govern” the particular standards at issue here, namely what level of accessibility for blind individuals is required for airport kiosks. Montalvo, 508 F.3d at 472 (emphasis added). Further, the regulation is unmistakably pervasive in the pertinent sense, in that it exhaustively regulates the relevant attributes of accessible kiosks. Given its great detail and pervasive extent, the new regulation preempts any state regulation of that same field. See id.
As the Federation notes, the regulation does not require that airlines make such accessible kiosks immediately available. Rather, the regulation establishes a time-line, gradually increasing the availability of accessible kiosks. First, all kiosks installed on or after December 12, 2016, must meet the accessibility specifications defined by the regulation, until 25% of the kiosks at each location at an airport are accessible. 14 C.F.R. § 382.57(a)(1). Second, airlines must ensure that at least 25% of kiosks at each location meet the regulation’s accessibility specifications by December 12, 2022. Id. § 382.57(a)(2).[17] In *736 other words, the regulation envisions that 25% of kiosks at each location will be accessible by the end of 2022, and requires in the mean time only that any new kiosks installed after December 12, 2016, be accessible until that 25% goal is reached.
That federal and state regulatory schemes “may require different ... deadlines” for compliance does not always establish a conflict between those schemes. Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc., 742 F.3d 414, 430 (9th Cir.2014). Here, however, DOT has very precisely dictated not only the substance of the accessible kiosk requirement, but also when airlines must come into full compliance with those substantive requirements, and what steps the airlines must take in the interim. The detail concerning timing demonstrates that the regulation is pervasive not only as to what standards apply, but also as to when compliance is required.
Moreover, DOT carefully calibrated the phase-in period for kiosk accessibility. First, while DOT initially considered a compliance deadline of only 60 days, it ultimately decided that such a short time-line would not be “feasible” given the time that would be required to develop, test, and market new accessible kiosks. 78 Fed.Reg. at 67,907. Second, DOT settled on the ultimate 10-y.ear deadline for airlines to ensure that 25% of kiosks are accessible at every location after considering the average life span of kiosks, indicating that “it is reasonable to conclude that well before the end of the 10-year period after the effective date of this rule virtually all airport kiosks will have reached the end of their life span” and will be replaced with accessible kiosks until the 25% threshold is reached. Id. at 67,908. Third, DOT initially raised the possibility of requiring airlines to retrofit existing kiosks as an interim measure, but ultimately rejected the idea as “an expensive, and in some cases, technically infeasible means to accomplish” the “more rapid near-term availability of accessible machines.” Id. at 67,909.
In this regard, the regulation resembles the airbag standard at issue in Geier. Rejecting the view, urged in that case, that DOT had “set[] a minimum airbag standard” but allowed state regulation to accelerate requirements because “the more airbags, and the sooner, the better,” Geier observed that DOT’s view was to the contrary:
The [DOT’s] comments, which accompanied the promulgation of [the rule], make clear that the standard deliberately provided the manufacturer with a range of choices among different passive restraint devices. Those choices would bring about a mix of different devices introduced gradually over time; and [the rule] would thereby lower costs, overcome technical safety problems, encourage technological development, and win widespread consumer acceptance-all of which would promote [the rule’s] safety objectives.
529 U.S. at 874-75, 120 S.Ct. 1913. Because the rule “deliberately sought a gradual phase-in of passive restraints,” id. at 879, 120 S.Ct. 1913, a rule requiring more immediate implementation would conflict with federal law and was therefore preempted, id. at 881,120 S.Ct. 1913.
Here, we consider not conflict preemption but field preemption. But the essential point is the same regarding phasing in the accessibility requirements: In pro *737 mulgating its regulation, the DOT made deliberate choices and devised nuanced, detailed phase-in requirements, thereby occupying the field of airport kiosk accessibility for the blind with regard to timing as well as substantively. Any accelerated state-law requirement is therefore preempted.
Finally, our conclusion that the new regulation occupies the field of kiosk accessibility is bolstered, but only marginally, by DOT’s assertions that it does. As a general matter, although we may give “ ‘some weight’ ” to “an agency’s explanation of how state law affects the [relevant] regulatory scheme,” we do “not defer[ ] to an agency’s conclusion that state law is pre-empted.” Wyeth v. Levine, 555 U.S. 555, 576, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009). “The weight we accord the agency’s explanation of state law’s impact on the federal scheme depends on its thoroughness, consistency, and persuasiveness.” Id. (citing United States v. Mead Corp., 533 U.S. 218, 234-35, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) and Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)).
Here, we give DOT’s statements minimal weight. DOT’s position is that, even before the current kiosk regulation was promulgated, “States [we]re already preempted from regulating in the area of disability civil rights in air transportation under the [ADA] and the ACAA.” 78 Fed. Reg. at 67,910 (emphasis added). The government has echoed that view before us, filing a supplemental amicus brief in this case maintaining that the DOT’s new regulation “further demonstrates that the federal government’s regulation of the accessibility of air transportation is so pervasive as to ‘occupy the field.’ ”
The government’s view that the field of air carrier accessibility is broadly preempted has the virtue of being consistent over time. See Nondiscrimination on the Basis of Handicap in Air Travel, 55 Fed.Reg. 8008, 8014 (Mar. 6, 1990); cf. Wyeth, 555 U.S. at 579-80, 129 S.Ct. 1187 (rejecting the agency’s “newfound opinion” in part because it represented “a dramatic change in position”). As noted, however, under our precedents, the pertinent field for purposes of field preemption analysis is not “air carrier accessibility” in general; it is airport kiosk accessibility for the blind. DOT’s statements do not, as our case law requires, delineate the specific field within which the federal ACAA regulations are preemptive, or explain why § 382.57 in particular occupies the field at issue here. We therefore find them unpersuasive.
Nevertheless, we do give some weight to DOT’s specific rejection of a saving provision in adopting the final kiosk regulation. In its regulatory commentary, DOT considered comments, including one submitted by the Federation, urging it to include a saving clause in 14 C.F.R. Pt. 382 to ensure the viability of concurrent state-law claims. 78 Fed.Reg. at 67,910. The comments had pointed out two district court decisions, including the decision on review in this case, holding preempted certain state law suits challenging inaccessible kiosks. Id. DOT refused to adopt a saving provision, concluding that “the detrimental impacts resulting from the concurrent operation of State/local disability non-discrimination laws on passengers with disabilities and on air transportation overall are serious and foreseeable.” Id. DOT’s rejection of the saving provision, which was proposed and rejected in the context of the exact issue raised here, confirms that DOT meant to leave no space for concurrent regulation of kiosk accessibility by the states. To that extent, DOT’s regulatory discussion bolsters our conclusion that the agency occupied the field of kiosk accessibility.

*738
8. Regulatory Authority

In its supplemental brief, the Federation argues that its suit does not conflict with the new regulation. In light of our conclusion that DOT has occupied the field, we need not reach that issue. As to field preemption, the Federation offers no argument that the new regulation is not pervasive; indeed, it is hard to see how it could do so.[18] Rather, apart from the argument, which we have already rejected — that implied field preemption is simply inapplicable because of the FAA saving clause — the Federation argues only that the new regulation cannot field preempt its claims because the regulation itself is invalid. We disagree.
Because we have concluded that DOT “meant to pre-empt” the claims at issue here, the question is simply “whether that action [wa]s within the scope of the [agency’s] delegated authority.” de la Cuesta, 458 U.S. at 154, 102 S.Ct. 3014. “[W]hen an agency administrator promulgates pervasive regulations pursuant to his Congressional authority, we may infer a preemptive intent unless it appears from the underlying statute or its legislative history that Congress would not have sanctioned the preemption.” Montalvo, 508 F.3d at 471.
We conclude that DOT acted within its authority in promulgating the field-preemptive § 382.57. First, regulations under the ACAA, like § 382.57, are “covered by the FAA’s general authorization that the Secretary ‘may take action ... considered] necessary to carry out’ the FAA’s ‘Air Commerce and Safety’ provisions, ‘including ... prescribing regulations, standards, and procedures, and issuing orders.’ ” Gilstrap, 709 F.3d at 1000 (quoting 49 U.S.C. § 40113(a)) (first alteration in original). As Gilstrap recognized, the ACAA, as part of the broader FAA, regulates “aviation commerce,” including principally “airlines’ interactions with their customers who have disabilities,” as well as “aviation safety.” Id. at 1005 & n. 14. Thus, Congress authorized DOT to promulgate regulations that, like § 382.57, speak to United’s interactions with its customers with disabilities in the context of its kiosks.
Second, even granting for the sake of argument the Federation’s argument that, in enacting the ACAA, “Congress did not in any way suggest that” it wanted to preempt state law, this “narrow focus on Congress’ intent to supersede state law [i]s misdirected.” de la Cuesta, 458 U.S. at 154, 102 S.Ct. 3014. “A pre *739 emptive regulation’s force does not depend on express congressional authorization to displace state law.” Id. Rather, as we have explained, “the correct focus is on the federal agency that seeks to displace state law and on the proper bounds of its lawful authority to undertake such action.” City of N.Y. v. F.C.C., 486 U.S. 57, 64, 108 S.Ct. 1637, 100 L.Ed.2d 48 (1988). Nothing in the text or legislative history of the ACAA convinces us that “Congress would not have sanctioned the preemption” intended by the DOT. Montalvo, 508 F.3d at 471; see also Gilstrap, 709 F.3d at 999-1000, 1006-07 (reviewing the legislative history of the ACAA, and concluding that DOT’s regulation had field-preemptive effect).[19]
Third, we reject the Federation’s argument that the regulation is invalid because the ACAA “is limited to prohibiting discrimination in ‘air transportation,’ ” but does not extend to “subsidiary activities” like the operation of airport kiosks that “do not move people or things by aircraft.”[20] The ACAA provides that, “[i]n providing air transportation, an air carrier ... may not discriminate against an otherwise qualified individual” on the basis of current, past, or perceived disability. 49 U.S.C. § 41705(a). But we have understood, and continue to understand, the term “[i]n providing air transportation,” id., broadly, to generally include “airlines’ interactions with their customers who have disabilities.” Gilstrap, 709 F.3d at 1005 n. 14.
In Gilstrap, for example, we held that the ACAA regulations occupied the field implicated by Gilstrap’s claim that “United did not provide the assistance that Gilstrap requested for moving through the airports.” 709 F.3d at 1007 (emphasis added). Moving through an airport is not air transportation, yet we concluded that the ACAA regulations validly preempted the application of any different or higher state standard of care as to that issue. Id. Consistent with Gilstrap, we conclude that “[t]he ACAA was intended to ensure nondiscriminatory treatment of airline passengers,” Elassaad v. Independence Air, Inc., 613 F.3d 119, 133 (3d Cir.2010), whether on an airplane, in an airport, at a kiosk, or otherwise. DOT thus has authority to promulgate regulations, like the one at issue here, that concern the ability to use devices designed to facilitate the provision of airplane transportation.
Fourth, we also reject the Federation’s argument that, because Congress did not intend the ACAA to apply to intra state air transportation, the Federation’s claims, to the extent they relate to purely intrastate travel, are not preempted.[21] The Federation is correct that the term “air transportation” is defined in the FAA as “foreign air transportation, interstate air transportation, or the transportation of mail by aircraft,” apparently exclusive of intrastate air transportation. 49 U.S.C. *740 § 40102(a)(5); see also 14 C.F.R. § 298.2 n.l. But DOT’S authority to promulgate regulations is not so constrained as the Federation suggests. Rather, the Secretary “may take action [he] considers necessary” to effectuate the provisions at issue here. 49 U.S.C. § 40113(a).
United, like most airlines, does not maintain separate kiosks for interstate travel and intrastate travel. Faced with the likelihood of a single set of kiosks, the Secretary could reasonably conclude that a rule governing accessibility of kiosks in general is “necessary” to ensure ACAA compliance with regard to interstate travel. Thus, the Federation’s argument fails to demonstrate that the regulation is beyond DOT’S authority.
Finally, the Federation notes that it has, in a different case, challenged the new regulation’s validity under the Administrative Procedure Act (“APA”), 5 U.S.C. § 551 et seq., and that, if the challenge is successful, “the rulemaking may be invalidated, in which case there would no longer be any basis for implied preemption of the claims that are subject to this appeal.”[22] The filing of a case in a different jurisdiction that might lead to the rule’s invalidation has no pertinence to the preemption question before this court.[23]
In sum, § 382.57 pervasively and comprehensively regulates the field of airport kiosk accessibility, and is within DOT’s delegated authority. We therefore hold that the Federation’s state-law claims are impliedly field preempted under the ACAA.
CONCLUSION
For the reasons stated above, the Federation’s state-law claims are not expressly preempted by the ADA. They are, however, impliedly field preempted by the ACAA and 14 C.F.R. § 382.57. Accordingly, we affirm the district court’s dismissal of the Federation’s state-law claims.[24]
AFFIRMED.
APPENDIX
14 C.F.R. § 382.57
§ 382.57 What accessibility requirements apply to automated airport kiosks?
Effective: December 12, 2013
(a) As a carrier, you must comply with the following requirements with respect to any *741 automated airport kiosk you own, lease, or control at a U.S. airport with 10,000 or more enplanements per year.
(1) You must ensure that all automated airport kiosks installed on or after December 12, 2016, are models that meet the design specifications set forth in paragraph (c) of this section until at least 25 percent of automated kiosks provided in each location at the airport (i.e., each cluster of kiosks and all standalone kiosks at the airport) meets this specification.
(2) You must ensure that at least 25 percent of automated kiosks you own, lease, or control in each location at a U.S. airport meet the design specifications in paragraph (c) of this section by December 12, 2022.
(3) When the kiosks provided in a location at the airport perform more than one function (e.g., print boarding passes/ bag tags, accept payment for flight amenities such as seating upgrades/meals/WiFi access, rebook tickets, etc.), you must ensure that the accessible kiosks provide all the same functions as the inaccessible kiosks in that location.
(4) You must ensure that a passenger with a disability who requests an accessible automated kiosk is given priority access to any available accessible kiosk you own, lease, or control in that location at the airport.
(5) You must ensure that each automated airport kiosk that meets the design specifications in paragraph (c) of this section is:
(i) Visually and tactilely identifiable to users as accessible (e.g., an international symbol of accessibility affixed to the front of the device).
(ii) Maintained in proper working condition.
(b) As a carrier, you must comply with the following requirements for any shared-use automated airport kiosks you jointly own, lease, or control at a U.S. airport with 10,000 or more enplanements per year.
(1) You must ensure that all shared-use automated airport kiosks you jointly own, lease, or control installed on or after December 12, 2016, meet the design specifications in paragraph (c) of this section until at least 25 percent of automated kiosks provided in each location at the airport (i.e., each cluster of kiosks and all stand-alone kiosks at an airport) meet this specification.
(2) You must ensure that at least 25 percent of shared-use automated kiosks you own, lease, or control in each location at the airport meet the design sped-' fications in paragraph (c) of this section by December 12, 2022.
(3) When shared-use automated kiosks provided in a location at the airport perform more than one function (e.g., print boarding passes/bag tags, accept payment for flight amenities such as seating upgrades/meals/WiFi access, rebook tickets, etc.), you must ensure that the accessible kiosks provide all the same functions as the inaccessible kiosks in that location.
(4) You must ensure that each automated airport kiosk that meets the design specifications set forth in paragraph (c) of this section is:
(i) Visually and tactilely identifiable to users as accessible (e.g., an international symbol of accessibility affixed to the front of the device; and
(ii) Maintained in proper working condition.
(5) As a carrier, you are jointly and severally liable with airport operators and/or other participating carriers for ensuring that shared-use automated airport kiosks are compliant with the re *742 quirements of paragraphs (b) and (c) of this section.
(c) You must ensure that the automated airport kiosks provided in accordance with this section conform to the following technical accessibility standards with respect to their physical design and the functions they perform:
(1) Self contained. Except for personal headsets and audio loops, automated kiosks must be operable without requiring the user to attach assistive technology-
(2) Clear floor or ground space. A clear floor or ground space complying with section 305 of the U.S. Department of Justice’s 2010 ADA Standards for Accessible Design, 28 CFR 35.104 (defining the “2010 Standards” for title II as the requirements set forth in appendices B and D to 36 CFR part 1191 and the requirements contained in 28 CFR 35.151) (hereinafter 2010 ADA Standards) must be provided.
(3) Operable parts. Operable parts must comply with section 309 of the 2010 ADA Standards, and the following requirements:
(i) Identification. Operable parts must be tactilely discernible without activation;
(ii) Timing. Where a timed response is required, the user must be alerted visually and by touch or sound and must be given the opportunity to indicate that more time is required;
(iii) Status indicators. Status indicators, including all locking or toggle controls or keys (e.g., Caps Lock and Num Lock keys), must be discernible visually and by touch or sound; and (iv) Color. Color coding must not be used as the only means of conveying information, indicating an action, prompting a response, or distinguishing a visual element.
(4) Privacy. Automated airport kiosks must provide the opportunity for the same degree of privacy of input and output available to all individuals. However, if an option is provided to blank the screen in the speech output mode, the screen must blank when activated by the user, not automatically.
(5) Output. Automated airport kiosks must comply with paragraphs (c)(5)(i) through (iv) of this section.
(i) Speech output enabled. Automated airport kiosks must provide an option for speech output. Operating instructions and orientation, visible transaction prompts, user input verification, error messages, and all other visual information for full use must be accessible to and independently usable by individuals with vision impairments. Speech output must be delivered through a mechanism that is readily available to all users, including but not limited to, an industry standard connector or a telephone handset. Speech output must be recorded or digitized human, or synthesized. Speech output must be coordinated with information displayed on the screen. Speech output must comply with paragraphs (c)(5)(i)(A) through (F) of this section.
(A) When asterisks or other masking characters are used to represent personal identification numbers or other visual output that is not displayed for security purposes, the masking characters must be spoken (“*” spoken as “asterisk”) rather than presented as beep tones or speech representing the concealed information.
(B) Advertisements and other similar information are not required to *743 be audible unless they convey information that can be used in the transaction being conducted.
(C) Speech for any single function must be automatically interrupted when a transaction is selected or navigation controls are used. Speech must be capable of being repeated and paused by the user.
(D) Where receipts, tickets, or other outputs are provided as a result of a transaction, speech output must include all information necessary to complete or verify the transaction, except that—
(1) Automated airport kiosk location, date and time of transaction, customer account numbers, and the kiosk identifier are not required to be audible;
(2) Information that duplicates information available on-screen and already presented audibly is not required to be repeated; and
(3) Printed copies of a carrier’s contract of carriage, applicable fare rules, itineraries and other similar supplemental information that may be included with a boarding pass are not required to be audible.
(Ü) Volume control. Automated kiosks must provide volume control complying with paragraphs (c)(5)(ii)(A) and (B) of this section. (A) Private listening. Where speech required by paragraph (e)(5)(i) of this section is delivered through a mechanism for private listening, the automated kiosk must provide a means for the user to control the volume. A function must be provided to automatically reset the volume to the default level after every use.
(B) Speaker volume. Where sound is delivered through speakers on the automated kiosk, incremental volume control must be provided with output amplification up to a level of at least 65 dB SPL. Where the ambient noise level of the environment is above 45 dB SPL, a volume gain of at least 20 dB above the ambient level must be user selectable. • A function must be provided to automatically reset the volume to the default level after every use.
(iii) Captioning. Multimedia content that contains speech or other audio information necessary for the comprehension of the content must be open or closed captioned. Advertisements arid other similar information are not required to be captioned unless they convey information that can be used in the transaction being conducted.
(iv) Tickets and boarding passes. Where tickets or boarding passes are provided, tickets and boarding passes must have an orientation that is tac-tilely discernible if orientation is important to further use of the ticket or boarding pass.
(6) Input. Input devices must comply with paragraphs (c)(6)® through (iv) of this section.
(i) Input controls. At least one input control that is tactilely discernible without activation must be provided for each . function. Where provided, key surfaces not on active areas of display screens, must be raised above surrounding surfaces. Where touch or membrane keys are the only method of input, each must be tactilely discernible from surrounding surfaces and adjacent keys.
*744 (ii) Alphabetic keys. Alphabetic keys must be arranged in a QWERTY keyboard layout. The “F” and “J” keys must be tactilely distinct from the other keys.
(iii) Numeric keys. Numeric keys must be arranged in a 12-key ascending or descending keypad layout or must be arranged in a row above the alphabetic keys on a QWERTY keyboard. The “5” key must be tactilely distinct from the other keys.
(iv) Function keys. Function keys must comply with paragraphs (c)(6)(iv)(A) and (B) of this section.
(A) Contrast. Function keys must contrast visually from background surfaces. Characters and symbols on key surfaces must contrast visually from key surfaces. Visual contrast must be either light-on-dark or dark-on-light. However, tactile symbols required by (c)(6)(iv)(B) are not required to comply with (c)(6)(iv)(A) of this section.
(B) Tactile symbols. Function key surfaces must have tactile symbols as follows: Enter or Proceed key: raised circle; Clear or Correct key: raised left arrow; Cancel key: raised letter ex; Add Value key: raised plus sign; Decrease Value key: raised minus sign.
(7)Display screen. The display screen must comply with paragraphs (c)(7)(i) and (ii) of this section.
(i) Visibility. The display screen must be visible from a point located 40 inches (1015 mm) above the center of the clear floor space in front of the automated kiosk.
(ii) Characters. Characters displayed on the screen must be in a sans serif font. Characters must be 3/16 inch (4.8 mm) high minimum based on the uppercase letter “I.” Characters must contrast with their background with a minimum luminosity contrast ratio of 3:1.
(8) Braille instructions. Braille instructions for initiating the speech mode must be provided. Braille must comply with section 703.3 of the 2010 ADA Standards.
(9) Biometrics. Biometrics must not be the only means for user identification or control, unless at least two biometric options that use different biological characteristics are provided.
(d) You must provide equivalent service upon request to passengers with a disability who cannot readily use your automated airport kiosks (e.g., by directing a passenger who is blind to an accessible automated kiosk, assisting a passenger in using an inaccessible automated kiosk, assisting a passenger who due to his or her disability cannot use an accessible automated kiosk by allowing the passenger to come to the front of the line at the check-in counter).

. The National Federation of the Blind is a non-profit advocacy group on behalf of the blind. The majority of its 50,000 members are blind persons, a protected class under California disability anti-discrimination law. See Cal. Gov.Code § 12926; Cal. Civ.Code §§ 51, 54.

.Automatic Teller Machines ("ATMs”) are required to be equipped with such technologies. See 2010 Americans with Disabilities Act Standards for Accessible Design, § 707, available at http://www.ada.gov/regs2010/2010 ADAStandards/201 OADAstandards. htm# pgfId-1006537.

. There are no California cases or regulations specifically addressing whether California law does so require.

. United also argued that the Federation's complaint failed to state a claim under California law.

. We reach the express preemption question because it was a basis for the district court’s decision and was one of the primary arguments raised on appeal. It was that issue that prompted us to vacate submission pending the Supreme Court’s resolution of Northwest, Inc. v. Ginsberg, — U.S. —, 134 S.Ct. 1422, 188 L.Ed.2d 538 (2014). We then directed the parties to file supplemental briefs addressing the effect on this appeal of the construction of the express preemption clause of the Airline Deregulation Act adopted in Northwest. Had we reached the opposite conclusion — that the Federation’s claims were expressly preempted under the ADA — that conclusion would have been dispositive, as it would have rendered it unnecessary to proceed to the issue of implied preemption under the Air Carrier Access Act. A decision that a hotly contested, potentially dispositive issue is not dispositive, and a reasoned explanation as to why, is one function of a considered and informative judicial decision. Whether such an issue is properly discussed (that is, not "dicta”) should not depend on which way the court decides it. See, e.g., United States v. Ingham, 486 F.3d 1068, 1078 n. 8 (9th Cir.2007).
According to the concurring opinion, Part I should be disregarded as non-precedential dicta. For the reasons we have given, we do not believe that is so. In the end, however, the degree to which Part I has precedential force in a particular future case will be for the future court to decide. See, e.g., Cetacean Cmty. v. Bush, 386 F.3d 1169, 1173 (9th Cir.2004) (analyzing whether statements in an earlier Ninth Circuit opinion were precedential or "nonbinding dicta”).

. The saving clause currently reads as follows: "A remedy under this part is in addition-to any other remedies provided by law.” 49 U.S.C. § 40120(c).

. This clause was originally located at 49 U.S.C.App. § 1305(a)(1) and preempted state laws "relating to [air carrier] rates, routes, or services.” In 1994, § 1305(a)(1) was amended and incorporated into the Federal Aviation Administration Authorization Act of 1994 to prohibit the enactment or enforcement of state laws "related to price, route, or service of an air carrier.” 49 U.S.C. § 41713(b)(1) (emphasis added). Congress intended this amendment "to make no substantive change.” Wolens, 513 U.S. at 238 n. 1, 115 S.Ct. 817 (citing Pub.L. No. 103-272, § 1(a), 108 Stat. 745 (1994)).

. United does not argue that the Federation’s claims relate to United’s prices or routes.

. Northwest’s other holdings, that the ADA’s express preemption provision may apply to common-law rules, 134 S.Ct. at 1429-30, and that the particular claim for breach of the duly of good faith and fair dealing at issue did not fall within the Wolens exception to preemption for contractual claims, id. at 1431— 33, have no application to this case.

. As noted, the ACAA is contained within the same "part” of the FAA, which is Part A of Title 49, Subtitle VII. See 49 U.S.C. Subtit. VII, Part A.

. The Safety Act’s express preemption clause provided that
Whenever a Federal motor vehicle safety standard established under this subchapter *732 is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment^] any safety standard applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the Federal standard.
15 U.S.C. § 1392(d) (1988), repealed by Pub.L. No. 103-272, § 7(b), 108 Stat. 1379 (1994).

. The interim rule provided, in its entirety: "As a carrier, if your automated kiosks in airport terminals cannot readily be used by a passenger with a disability for such functions as ticketing and obtaining boarding passes that the kiosks make available to other passengers, you must provide equivalent service to the passenger {e.g., by assistance from your personnel in using the kiosk or allowing the passenger to come to the front of the line at the check-in counter).” 14 C.F.R. § 382.57 (2008).

. As Gilstrap explained, while our earlier decision in Montalvo, 508 F.3d at 473, had "contained some broad language concerning the reach of FAA preemption^] ... Martin clarified that Montalvo should not be read ... expansively” with regard to the relevant field for preemption purposes. Gilstrap, 709 F.3d at 1004.

. With regard to speech output, as for other matters, the current regulation provides an extremely fine-cut level of detail. The regulation provides, for example, that, “[w]hen asterisks or other masking characters are used to represent personal identification numbers or other visual output that is not displayed for security purposes, the masking characters must be spoken (“ * ” spoken as "asterisk”) rather than presented as beep tones or speech representing the concealed information.” 14 C.F.R. § 382.57(c)(5)(i)(A). As to the volume of speech output, the regulation instructs:
Where sound is delivered through speakers on the automated kiosk, incremental volume control must be provided with output amplification up to a level of at least 65 dB SPL. Where the ambient noise level of the environment is above 45 dB SPL, a volume gain of at least 20 dB above the ambient level must be user selectable. A function must be provided to automatically reset the volume to the default level after every use.
Id. § 382.57(c)(5)(ii)(B).

. Again demonstrating its extreme precision, the regulation specifies the particular symbols to be used for “function keys”: "Enter or Proceed key: raised circle; Clear or Correct key: raised left arrow; Cancel key: raised letter ex; Add Value key: raised plus sign; Decrease Value key: raised minus sign.” 14 C.F.R. § 382.57(c)(6)(iv)(B).

. "You must provide equivalent service upon request to passengers with a disability who cannot readily use your automated airport kiosks (e.g., by directing a passenger who is blind to an accessible automated kiosk, assisting a passenger in using an inaccessible automated kiosk, assisting a passenger who due to his or her disability cannot use an accessible automated kiosk by allowing the passenger to come to the front of the line at the check-in counter).” Id. § 382.57(d).

.Both rules apply only to kiosks at airports with “10,000 or more enplanements per year.” 14 C.F.R. § 382.57(a). The regulation specifies that “location” refers to “each cluster of kiosks and all stand-alone kiosks at *736 the airport.” Id. § 382.57(a)(1). Finally, the regulation imposes these requirements both as to kiosks a particular airline owns, leases, or controls, id. § 382.57(a), and as to "shared-use” kiosks that an airline jointly owns, leases, or controls, id. § 382.57(b).

. In its opening brief, filed before the current regulation became final, the Federation argued that the interim regulation was not pervasive. It noted that:
"Federal agencies have shown that they are capable of pervasive regulation of self-service terminals similar to air carrier kiosks, and that type of regulation is absent here. For example, the comprehensive standards for ATMs and fare machines in the 2010 Americans with Disabilities Act Standards for Accessible Design address such details as clear ground or floor space around machine; speech output for instructions, orientation, transaction prompts, error messages, and all information displayed on the machine's screen; privacy of input and output; the need for tactile input controls for all functions; the layout of numeric and function keys; visibility and characters used on the display screen; and volume control.”
DOT's final kiosk regulation addresses all or nearly all of these topics. Indeed, the technical specifications in the final regulation were based on the very same 2010 ATM accessibility standards to which the Federation pointed as an example of pervasive regulation. See 78 Fed.Reg. at 67,902-03; Nondiscrimination on the Basis of Disability in Air Travel: Accessibility of Web Sites and Automated Kiosks at U.S. Airports, 76 Fed.Reg. 59,307-01 (Sept. 26, 2011).

.The Federation points to legislative history indicating that the ACAA was modeled after § 504 of the Rehabilitation Act, argues that the latter Act permits concurrent state regulation, and asks us to infer that Congress therefore intended the same as to the ACAA. United and the United States point to countervailing indications in the legislative history, including a desire that disabled persons have the benefit of consistent accessibility practices. See 55 Fed.Reg. at 8012 (citing legislative history). Taken together, we are not persuaded that the legislative history establishes Congressional intent to foreclose field-preemptive regulations like the one at issue here.

. This argument appears to have been raised for the first time in the Federation’s reply brief. We assume for the sake of'argument that it has not been waived.

. Again, although the issue was not raised in the district court, we assume for the sake of argument that it has not been waived.

. The Federation initially filed that suit in the U.S. District Court for the District of Columbia, but that court ruled that it lacked jurisdiction over that case, transferring it to the D.C. Circuit in lieu of dismissal. See Nat’l Fed'n of the Blind v. U.S. Dep’t of Transp., No. 14-CV-85 (TSC), 78 F.Supp.3d 407, 2015 WL 349156 (D.D.C. Jan. 28, 2015). The case remains pending.

. We do not understand the Federation to have argued in this case that the regulation is invalid under the APA, notwithstanding its statement that it "adopt[sj” the challenge to the rulemaking. To the extent that the Federation has gestured at such an argument, we decline to address it, both because the Federation has not "specifically and distinctly argue[d]” it, United States v. Marcia-Acosta, 780 F.3d 1244, 1250 (9th Cir.2015) (internal quotation marks omitted), and because it raises an issue essentially different from the one the Federation has heretofore presented on appeal.

.The parties have never suggested that a different result with regard to field preemption is warranted as between the Federation's damages claims and its claims for declaratory and injunctive relief, despite the additional opportunity to do so afforded by our supplemental briefing order. We generally do not reach issues that the parties have not raised. See, e.g., Eid v. Alaska Airlines, Inc., 621 F.3d 858, 875 (9th Cir.2010) ("Because plaintiffs don’t make a [potentially dispositive] argument, we say nothing on that score.”). Particularly in light of the lack of any California authority addressing whether that State’s law does impose a different standard for kiosk accessibility, we decline to do so in this case.